Ella LOGAN, Plaintiff,

v.

**ST. LUKE'S–ROOSEVELT HOSPITAL CENTER and Dr. Rita Franzese, Defendants.**

**No. 84 Civ. 2676 (RWS).**

United States District Court, S.D. New York.

May 20, 1986.

Ella L. Logan, pro se, Brooklyn, New York.

Simpson Thacher & Bartlett, P.C., New York City, for defendants; Terri Solomon, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Ella Logan, who is proceeding *pro se*, has filed this civil rights action pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.*[1] ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981,[2] ("section 1981"), the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621[3] *et seq* ("ADEA"), the Fourteenth Amendment to the United States Constitution, and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq* ("ERISA"), and several common-law contract claims, contending that the termination of her employment was motivated by race and age discrimination. Logan is black and was born on August 1, 1935. Defendants St. Luke's-Roosevelt Hospital Center (the "Hospital") and Dr. Rita Franzese ("Franzese") have moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. contending that no material issue of fact is disputed, and that defendants are entitled to summary judgment as a matter of law. For the reasons set forth below, the Hospital's motion is granted, as Logan has failed to show that her termi-

nation had a discriminatory purpose or basis.

**Prior Proceedings**

Logan filed this action on April 16, 1984 and filed her amended complaint on May 3, 1984, alleging the above-enumerated statutory civil rights and ERISA violations and claims against the Hospital based on New York State breach of contract law and estoppel principles. At the close of discovery, this court issued an order permitting the defendants to move for summary judgment by January 26, 1986. The motion was taken on submission of the parties on March 14, 1986. On January 14, 1986, Logan's counsel moved to be relieved from the case, stating that Logan could not prove the allegations in the amended complaint and that she had refused a "reasonable" settlement offer against the advice of counsel.

**Facts**

Logan's employment history with St. Luke's emerges from the voluminous deposition testimony and exhibits which the Hospital has submitted in connection with its summary judgment motion. On June 28, 1965, Logan was hired as a "Charge Dietician" or "Head Dietician" at St. Luke's Hospital, prior to its merger with Roosevelt Hospital in 1979. In her deposition, Logan stated that she applied for employment at St. Luke's to enhance her career by working at a private hospital with an outstanding reputation. She applied for no other positions at that time and prior to accepting this position and saw no person-

---

1. Title VII, 42 U.S.C. § 2000e–2(a)(1) which prohibits racial discrimination in an employment decision, provides in part:

   It shall be unlawful employment practice for an individual employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...

2. 42 U.S.C. § 1981 provides:

   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to

the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

3. The Age Discrimination in Employment Act provides in part:

   It shall be unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age, ...

   29 U.S.C. § 623(a)(1).

nel manuals produced by the Hospital before accepting the job.

The Food Service Department, whose name was changed in 1985 to the Department of Food and Nutrition Services, consisted of a Director of Food Services and an Assistant Director of Food Services who supervised two kitchens, the "Main Kitchen" and the "Women's Kitchen," each with a Food Production Manager. At the same managerial level was a Chief Therapeutic Dietician, a Cafeteria Manager, and a Storeroom Supervisor who also reported to the Assistant Director and Director of Food Services. Between 1965 and 1982, Logan's title changed from Charge or Head Dietician in 1965, to Administrative Dietician in 1967, to Food Production Manager of the Women's Kitchen in 1973.

In her capacity as Food Production Manager, Logan reported to Mr. Robert Nelson ("Nelson"), the former Director of Food Service. While Logan received some positive reports on her job performance from Nelson and others during this time (Exhibit 2, plaintiff's opposition), Nelson criticized and warned Logan about her poor job performance and commented about her "problem in maintaining a good working relationship with departmental office" and her need for "improvement in personnel relationships." The Hospital has also documented several instances when Logan was cited for failure to perform certain duties. Logan responded to these criticisms in a memorandum of July 27, 1975 expressing her disagreement with Nelson's evaluation. Although the Hospital has produced surveys from the Joint Commission on Accreditation of Hospitals ("JCAH") and the New York State Department of Health ("DOH") and internal hospital audits which show that the Women's Kitchen was cited for several New York State Health Code and JCAH violations while under Logan's management, the Hospital has not produced evidence of the records of other departments during this period.

In 1975, Logan filed race and sex discrimination charges against Nelson and the Hospital with the New York State Division of Human Rights ("SDHR") and the Equal Employment Opportunity Commission ("EEOC"), claiming that her failure to be awarded position of Assistant Director of Food Services was discriminatory. When both agencies found no probable cause to believe that Logan's discrimination claims were valid, Logan filed a complaint in this court pursuant to Title VII and section 1981 which culminated in a bench trial where the Honorable Lloyd F. MacMahon concluded that neither the Hospital nor Nelson had discriminated against Logan. *Logan v. St. Luke's Hospital Center*, 428 F.Supp. 127 (S.D.N.Y.1977).

On December 20, 1981, Logan was asked to assume the position of Acting Food Production Manager in the Main Kitchen, a post which increased her salary by $2,000.00 annually. On February 15, 1982, Franzese, a white woman born on February 11, 1947, replaced Nelson as Director of Food Services. When Franzese assumed the directorship of food services, Logan had received only $1,000 of the $2,000 which she had been promised in exchange for taking the job as Acting Food Production Manager. After investigating Logan's entitlement to the additional money, the $1,000 was paid to Logan and was made retroactive to December 20, 1981.

At the outset of Franzese's tenure, she sent a series of memoranda to Logan concerning missed deadlines, failure to complete certain duties, and certain unsanitary conditions in the Main Kitchen under her supervision. Pursuant to the Hospital Personnel Department's evaluation procedures, which provide that employees assuming a new position should be evaluated approximately three months after assuming the new position, Franzese gave Logan a performance appraisal on June 29, 1982. While Logan contends that the initiation of this performance evaluation was itself discriminatory, a similar evaluation of two other managerial employees, Brigid Connelly, (white), Acting Food Producing Manager in the Women's Kitchen and Bruce Heath (white), Assistant Director of Food Services, was undertaken approximately

four months after their assumption of new posts. Franzese concluded that Logan's performance was "marginal" and that she needed to improve her time management, her communication with employees and her delegation of responsibility. Franzese instructed Logan to concentrate on eliminating all health code violations, and annexed a list of twenty-five incomplete assignments to this evaluation. Logan responded to this negative evaluation in a memorandum which detailed Logan's view that Franzese's supervision was uncooperative and that Franzese was undermining her authority.

Pursuant to the Hospital's personnel policies, Logan was permitted to read but not receive a copy of such performance evaluations. Performance evaluations are not subject to the Hospital's grievance procedures, however, Franzese discussed her evaluation with Logan on July 29, 1982 and again on August 2, 1982 with Elaine Yastrab, Assistant Vice President for Support Services. Logan contends in her opposition papers that this refusal to give her a copy of the performance evaluation was a new policy aimed at preventing her from preparing a rebuttal to the evaluation, however, she offers no evidence to substantiate her belief that she was the "target" of such a policy or that it was applied in a discriminatory manner. Neither Brigid Connolly nor Bruce Heath received a copy of his performance evaluations during this period.

The Hospital has also documented Main Kitchen employees and union representative complaints about Logan's treatment of Main Kitchen employees. Of the fifteen employees whose participation in these grievance sessions was recorded, eleven are black and four are Hispanic. The complaints concerned, inter alia, Logan's lack of respect for her subordinates, her harassing tone of voice, improperly ordered food and attendant delays in patient service and inefficiencies in the running of the kitchen. Logan claims that Franzese solicited these complaints from employees, but has no substantiation for this belief.

On July 28, 1982, Franzese and Logan conducted a "quality assurance audit" of the Main Kitchen pursuant to the Hospital's internal audit system designed to monitor compliance with JCAH and Health Code standards. Franzese gave Logan a 40% sanitation score, remarking that "the poor sanitary conditions have not significantly improved, ..." and "our patient's [sic] health is seriously jeopardized." Logan disputes Franzese's method of computing that score and charges that Franzese deflated her performance to discredit her.

On August 6, 1982, Franzese informed Logan that in light of her failure to respond to Franzese's improvement suggestions in the June 29, 1982 evaluation, and in view of her poor quality assurance audit performance, Logan was required to correct all deficiencies uncovered in the audit by October 1, 1982 (one month prior to the JCAH survey), or assume the job of Dietician for the Outpatient Clinic or Procurement Manager of Purchasing, Stores, and Issuing. Logan chose the position Of Procurement manager, which she assumed on September 14, 1982, a post which included managing the food storeroom and ordering food supplies for the two hospital kitchens. Franzese and several storeroom employees had similar complaints about Logan's management of the storeroom. Franzese has documented reminders which she sent to Logan concerning overdue assignments, her failure to follow competitive bidding procedures and her general failure to efficiently schedule delivery of food to the two kitchens.

Franzese's most strident criticism of Logan concerned two incidents, one in which Logan failed to complete a "Disaster Plan" prior to the JCAH survey in November, 1982, and one in which Logan was reprimanded with an insubordination warning by Franzese for failing to report to work at 6:00 a.m. during the vacation of Mr. Lessie Cephus, the Storeroom Supervisor who usually opened the area in the morning. Logan's opposition papers take issue with each of these criticisms, as she contends that she was entitled to delegate another

employee to arrive at 6:00 a.m., that Franzese's failure to cooperate with her requirements made it impossible to complete the Disaster Plan, and that her inventory management and bid solicitations were correct under the prevailing procedures.

On January 10, 1983, Franzese again evaluated Logan's performance and decided to terminate Logan's employment on April 8, 1983, giving Logan three months to find another job. Franzese also offered Logan the option of resigning rather than being fired, but Logan declined. During the three months between her notice and termination, Logan was assigned to special projects in the Food Service Department which Franzese also claims were performed unsatisfactorily. Logan filed extensive comments in response to Franzese's final negative evaluation and termination decision, annexed as Exhibit 1 to Logan's opposition papers. Although this thirty-five page document, plus attachments, challenged Franzese's memoranda as inaccurate, contradictory, and exaggerated distortions of facts, the entire document makes no mention of any discrimination based on race or age. Logan concluded that Franzese's termination was based on false charges, and that she was being used as a "scapegoat" for the problems existing in the Food Service Department.

After her termination, Logan filed a grievance with the Personnel Department challenging the grounds for her termination. Ms. Janice McKelvey ("McKelvey"), Assistant Vice President for Human Resources, reviewed Logan's explanation for her negative performance reports and her complaints about Franzese's management. A hearing was held in McKelvey's office on April 18, 1983, where Logan was given the opportunity to submit additional evidence in support of her claim. McKelvey upheld Franzese's termination decision to terminate Logan, concluding in her letter of April 26, 1983 that:

> It is my considered opinion that you were given specific direction from your immediate supervisor and had appropriate response time and had adequate support from your own subordinates to accomplish the duties to which you were assigned. Yet your overall performance over an extended period of time did not satisfy the requirements of your position as detailed by the Director of the Food Service Department.

McKelvey also states in her affidavit that she concluded that Logan was resisting Franzese's directions and had refused to alter her performance in response to memoranda and negative evaluations.

### Food Service Department Employees

Logan alleges that during Franzese's tenure As Food Service Director, she engaged in a pattern of discriminatory firings and demotions aimed at racial minorities and older employees. The Local Rule 3(g) statement of the Hospital and the Franzese affidavit with annexed Exhibits G & H show that during Franzese's tenure at the Hospital, there were fourteen Food Service Department Supervisors, three of whom were Hispanic and the remainder were black. Of those fourteen supervisors, ten were over age forty.

At the managerial level above these supervisors, Franzese promoted two black managers, Ms. Andrew Penn, born August 20, 1939 from Kitchen Manager to Food Production Manager and Ms. Frankie Barnes, born January 14, 1939, from Cafeteria Manager to Cafeteria Manager/Coordinator. Franzese demoted three managerial employees, Ms. Ernestine Williams, who is black, from Chief Theraputic Dietician to Theraputic Dietician; Mr. Anthony Triant, who is white, from Kitchen Manager to Food Service Supervisor, for poor performance, and Mr. Jose Velez, an Hispanic from Food Production Manager to Food Service Supervisor, for poor performance. Promotions were denied to Ms. Susan Gordon, a white under age forty, for the post of Assistant Food Service Director, and Mr. James Walden, a white under age forty, who was denied the job of Food Production Manager in the Main Kitchen. Finally, Franzese fired Hipolito Irizarry, an Hispanic, for his admitted theft of Hospital property. Irizarry was later

reinstated by an arbitrator because of mitigating circumstances surrounding the theft.

Logan asserts that her dismissal from St. Luke's was the "result of discriminatory practices committed by defendant and its agents, owing to plaintiff's race and age" (Amended Complaint ¶ 30). According to Logan, Franzese's oral warnings and critical memoranda, Franzese's failure to promote her to the position of Assistant Food Service Director, her hiring of two white employees under age forty, one to fill the post which Logan had prior to her transfer to the Main Kitchen, and the other as Acting Food Service Director, demonstrates a pattern of harassment directed at Logan because of her age and race. In addition, Logan claims that the Hospital and Franzese failed to abide by hospital policies and procedures which required that she be progressively disciplined rather than being, as Logan perceives it, summarily dismissed after eighteen years of service with the Hospital. Further, Logan contends that the failure of the Hospital to provide her copies of negative performance evaluations was a policy designed to prevent her from effectively answering the charges against her.

The Hospital contends that Franzese has consistently promoted minority employees to senior managerial positions, and that Logan's dismissal was caused by her increasingly poor performance in managing food production for the Main Kitchen, and the series of complaints from employees concerning her communication and interpersonal skills. Furthermore, the Hospital claims that Franzese applied the proper procedures in Logan's termination, including advance warnings, improvement suggestions, and the opportunity to rebut charges and file grievances.

## Discussion

Franzese and the Hospital face a heavy burden in order to prevail on their summary judgment motion, as the Second Circuit applies a strict standard in recognition of the fact that summary judgment deprives the non-moving party of the opportunity for full factual development of the record through trial, *see Jaroslawicz v. Seedman*, 528 F.2d 727, 731 (2d Cir.1975). Therefore, a motion for summary judgment may not be granted "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy, and establishes affirmatively that the adverse party cannot prevail under any circumstances. *Heyman v. Commerce and Industry Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975). This standard is applied strictly, *Rodrigues v. Village of Larchmont*, 608 F.Supp. 467, 471 (S.D.N.Y.1985), and all reasonable inferences will be drawn in favor of the party opposing the motion. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam).

This burden is not insurmountable, and failure to allege substantial facts in dispute and reliance on unsubstantiated denials of the accuracy of the movants' affidavits will not defeat a motion for summary judgment. *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). These concepts are applicable even in the area of discrimination litigation where "[T]he salutary purposes of [Rule 56] to avoid long, expensive and harassing trials apply no less to discrimination cases than to commercial or other areas of litigation." *Nash v. Jacqueline Cochran, Inc.*, 548 F.Supp. 676, 678 (S.D.N.Y.1982).

## Title VII, Section 1981, ADEA

The Supreme Court, in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), has reiterated a three-step analysis for the burdens of proof and persuasion in a civil rights action brought under Title VII:

First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second ... the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection" ... the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination.

*Id.* at 252–53, 101 S.Ct. at 1093 (*quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

■ To establish a *prima facie* case of discrimination pursuant to this burden, Logan must show that: (1) she is a member of a racial minority; (2) that she was qualified for the job she was performing; (3) that she satisfied the normal requirements for her work; (4) that she was discharged; and (5) after her termination, a white employee was assigned to do the same work. *McDonnell Douglas Corp. v. Green, supra,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Community Affairs v. Burdine, supra,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6. This standard is equally applicable to claims brought under Section 1981, *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 44 (2d Cir.1984), and a similar standard applies to the age discrimination claims brought pursuant to the ADEA:

A *prima facie* case of age discrimination would consist of sufficient evidence to support a finding that (i) [plaintiff] was in the protected age group, (ii) [plaintiff] was qualified for [the] job, (iii) [plaintiff] was discharged, and (iv) the discharge occurred in circumstances which gave rise to an inference of age discrimination.

*Pena v. Brattleboro Retreat,* 702 F.2d 322, 324 (2d Cir.1983).

The Second Circuit has endorsed a liberal construction of the plaintiff's *prima facie* case requirements, explaining "the *de minimis* nature of a plaintiff's burden at the prima facie stage." *Meiri v. Dacon,* 759 F.2d 989, 996 n. 10 (2d Cir.), *cert. denied,* — U.S. —— 106 S.Ct. 91, 88 L.Ed.2d 74 (1985) (*citing Sweeney v. Research Foundation of St. Univ. of N.Y.,* 711 F.2d 1179 (2d Cir.1983)). Logan has established that she is black and over forty years of age, that she was discharged from St. Luke's, and that she was qualified for the job by virtue of her Bachelor of Science degree in

commercial dietetics (Amended Complaint ¶ 8–9), her previous employment as a Dietician with the New York Department of Hospitals, Maimonides Hospital and the Department of Corrections in New York, and her eighteen years of service in the Food Service Department of St. Luke's. The Hospital claims, however, that Logan cannot demonstrate that she satisfied the normal requirements of her work, or that she was replaced by a white employee after her termination.

■ In this court's view, however, Franzese and the Hospital are taking a "rigid, mechanized or ritualistic" view of the elements of the *prima facie* case which unduly burdens Logan at the threshold of her claim. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). While Logan must demonstrate that she "satisfied the normal requirements for her work," this inquiry should not be collapsed into a full scale evaluation of her job performance, which is the subject of the more searching "non-discriminatory reason" and "pretext" analysis of the second and third stages of analysis outlined in *McDonnell Douglas Corp. v. Green, supra; see also United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983). Here Logan has demonstrated that, at least during a period of time prior to Franzese's tenure, she was performing her duties at satisfactory levels. While the defendants have come forward with evidence of the Hospital's dissatisfaction and negative view of her performance, an evaluation of this balance should be reserved for a later stage of proof. *Mieri v. Dacon, supra,* 759 F.2d 995 (employees must be permitted to show that the employees demands were illegitimate or arbitrary).

Similarly, under the circumstances of Logan's dismissal, the fact that the Hospital did not appoint a white employee to manage the storeroom does not defeat Logan's *prima facie* showing. While Lessie Cephus, a black male, born May 5, 1940, assumed Logan's storeroom duties, Cephus

had been managing the storeroom prior to Logan's appointment and had requested that a supervisor be named to alleviate some of his burdens in that office. While Cephus retained the management of the storeroom after Logan's departure, it cannot be said that he replaced Logan in her position as supervisor. *See Meiri v. Dacon, supra,* 759 F.2d at 996. ("The fact that the position was ultimately eliminated is of little relevance and should not sound a death knell to Meiri's Title VII claim ... When examined against these conceptual underpinnings, we believe the fact that Meiri was not replaced by a non-jew—indeed, she was never replaced—may weaken, but certainly does not eliminate, the inference of discrimination"). Logan has therefore created an inference, albeit weak, that her termination was discriminatory, and the Hospital and Franzese bear the burden of articulating a legitimate non-discriminatory reason for her firing.

■ However, the defendants have provided overwhelming evidence in this case to show that Logan was fired because of honest dissatisfaction with her performance and her poor interpersonal relationships with her subordinates. The Hospital has demonstrated that since at least 1975, Logan was informed by her superiors that she needed to improve her personnel relationships and needed to pay closer attention to assignment deadlines. The Women's Kitchen, when under her supervision, was cited for JCAH and DOH violations. As Acting Food Production Manager for the Main Kitchen, Logan missed deadlines, failed to complete her assigned tasks and was reminded of these problems by memoranda from Franzese. Logan has admitted these shortcomings in deposition testimony (Logan Dep. at 436), and has not controverted the fact that she did not complete the "Disaster Plan" requested by Franzese, and failed to arrive at 6:00 a.m. when requested, resulting in an insubordination citation. Under these circumstances, the Hospital has produced enough evidence to show a neutral basis for its decision, *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir. 1980).

Logan, in response, has failed to offer any direct or circumstantial evidence whatsoever to demonstrate that St. Luke's dissatisfaction with her performance was a mere pretext for age and race discrimination. *Nash v. Jacqueline Cochran, Inc., supra,* 548 F.Supp. at 680. As the district court observed in *Wade v. New York Telephone Co.,* 500 F.Supp. 1170 (S.D.N.Y. 1980), Logan may establish pretext by showing (1) that white or younger employees with similarly poor work performances were retained; (2) that the employer's had a statistical pattern or practice of discrimination against minorities or older employees, or (3) direct evidence of the employers subjective intent. *Id.* at 1177–1178.

Logan complains generally that her termination was the result of age and race discrimination, but has not produced proof of pretext in any of the methods outlined in *Wade.* While Logan contends that she alone was denied copies of her negative performance evaluations, the Hospital has demonstrated that Brigid Connolly and Bruce Heath, two white employees also evaluated at the same time, did not receive copies of their performance reports, as Hospital policy then provided. Logan also has claimed that Franzese's request that she arrive at the hospital at 6:00 a.m. during Lessie Cephus' vacation was an act of discrimination and harassment, however, the affidavits from other Hospital employees demonstrate that four white managers in the Food Service Department have similarly reported to work at 6:00 a.m. when required, including Connolly and Heath, who are both white and under forty years old.

Finally, despite Logan's assertions, she has provided no evidence that other supervisors did not receive memoranda from Franzese critical of their performance, or that the large number of warnings and reminders directed to her attention does not bolster rather than detract from the Hospital's articulated nondiscriminatory motive for firing her. While several of these performance evaluations were subjec-

tive in nature, the most subjective aspects were confirmed by McKelvey, a black woman over forty years of age. *See Verdell v. Wilson,* 602 F.Supp. 1427, 1439 (E.D.N.Y. 1985) (when the evaluation is subjective and the evalutors are not members of the protected minority, the articulated reason for the decision may be subject to particularly close scrutiny).

Logan is similarly unable to show that Franzese or St. Luke's had a practice of discrimination against minorities or older employees. The statistics available to the court reveal quite the contrary; of the fourteen supervisors in the Food Service Department, three were Hispanic, eleven were black and ten out of the fourteen were older than age forty. Nor do the demotions or firings exhibit such discrimination. Ernestine Williams, a black Theraputic Dietician, was demoted with her consent, as she concurred in Franzese's dissatisfaction with her work; Anthony Triant, also demoted for poor performance, is white, and Jose Velez, a Hispanic was also demoted for poor performance. The Hospital has also documented that the firing of Hipolito Irizarry, a Hispanic, was prompted by his conceded theft of hospital property. The same evenhandedness is evident from the promotions granted during Franzese's tenure, as two black women over forty were promoted to higher managerial posts during this period, and two white employees, both under forty years of age, were denied promotions. In short, Logan has not demonstrated any age or racial bias in the promotion, demotion or firing of applicants in her department.

■ The only allegations of subjective racial animus appear, from Logan's deposition testimony, to be an assumption on Logan's part; a post-hoc rationalization for the negative reports on her job performance:

Q:  Ms. Logan, you have an allegation in your complaint that "After Dr. Franzese commenced employment at St. Luke's, a pattern of discriminatory conduct against the plaintiff ensued, intended to result in plaintiff's termination." I want you to tell me the basis for that statement and all basis for that statement.

A:  Number one, the poor evaluation that I got on June 29, 1982. I think—

Q:  You say that the poor evaluation was part of the pattern of discriminatory conduct?

A:  That's one. This is me looking backwards now, looking at what's happened to me. So you have to lump everything, all the negatives together and come up with my assumption.

(Logan Deposition at 278–79). Such an unsupported assumption that discrimination was the reason for her discharge is insufficient to establish a Title VII, Section 1981 or ADEA claim. *Dugan v. Martin Marietta Aerospace,* 760 F.2d 397, 399 (2d Cir. 1985).

Similarly, Logan's detailed rebuttal of Franzese's January 10, 1982 evaluation contains no mention of race or age discrimination, and Logan has not asserted that anyone in the Food Service Department made derogatory comments or references concerning her race or age. Considering the totality of Logan's work environment, she has failed to show that "a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095.

**Fourteenth Amendment, ERISA, Common Law**

■ Logan's remaining claims require less extensive treatment. Although Logan has claimed that this alleged discrimination violated her Fourteenth Amendment right to equal protection of the laws, she has not alleged that a state or someone acting under color of state authority participated in this alleged discrimination, a prerequisite to a Fourteenth Amendment claim. *District of Columbia v. Carter,* 409 U.S. 418, 423, 93 S.Ct. 602, 605, 34 L.Ed.2d 613, *reh. denied,* 410 U.S. 959, 93 S.Ct. 1411, 35

L.Ed.2d 694 (1973). The Second Circuit has conclusively held that a private, voluntary non-profit hospital such as St. Luke's, although licensed and regulated by the state, does not have a sufficiently close nexus with the state to constitute "state action" for purposes of the Fourteenth Amendment. *Schlein v. Milford Hospital, Inc.,* 561 F.2d 427 (2d Cir.1977).

■ Logan's ERISA claim, premised on the notion that she was fired in order to prevent her from obtaining early retirement benefits under the Hospital's plan, is also meritless. Although employees can recover pursuant to section 510 if they demonstrate that their dismissal was motivated by preventing the vesting of pension benefits, *Titsch v. Reliance Group, Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (1983), Logan has admitted that she is already vested in the Hospital's pension plan and may now elect early retirement, as she is over age fifty (Logan Dep. at 518–525, Def. Exh. VV at 6), and her deposition testimony indicates that the ERISA allegations in the complaint were prepared without knowledge that despite termination she was eligible to elect early retirement. As the only allegation underlying Logan's ERISA claim is misconceived, the Hospital is entitled to summary judgment in its favor on this claim. Furthermore, without these federal statutory claims, there is no independent jurisdiction for the pendent commonlaw claims of breach of contract and estoppel. When the federal claims upon which jurisdiction rests are dismissed before trial, the Supreme Court and the Second Circuit have held that district courts should not retain jurisdiction over the common law claims. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Nolan v. Meyer,* 520 F.2d 1276, 1280 (2d Cir.1975). Logan's common-law contract claims are therefore dismissed.

**Fees**

■ Title VII provides that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs," 42 U.S.C. § 2000e–5(k). The Supreme Court has explicitly held that defendants are entitled to fee awards under section 2000e–5(k), but only where the suit is "frivolous, unreasonable, or without foundation." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The Second Circuit has expressed its standard for the award of such attorney's fees, asserting that fees should be awarded to a prevailing defendant "only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." *Carrion v. Yeshiva University,* 535 F.2d 722, 727 (2d Cir.1976).

Logan's discrimination claim, although ultimately meritless, is not one which implicates the Congressional goal of discouraging baseless or frivolous actions by imposing sanctions on plaintiffs. *See Id.* at 727. Logan produced the barest essentials of a *prima facie* case in this action and documented her claims with extensive rebuttal material to the charges which the Hospital and Franzese leveled against her. Although discovery revealed that several allegations in Logan's claims were unsupportable, these shortcomings do not rise to the level of irresponsibility which has prompted other courts in this district to award counsel fees to a civil rights defendant. For example, in *Faraci v. Hickey-Freeman Co., Inc.,* 607 F.2d 1025 (2d Cir.1979), the Second Circuit affirmed an award of fees against a civil rights plaintiff charging discrimination on the basis of his nationality, where uncontroverted evidence revealed that the employees and supervisors at the plant were largely of Italian extraction, and that his termination was the result of insubordination and disruption which began just over one year after his arrival at the plant. Similarly, in *Colucci v. New York Times Co.,* 533 F.Supp. 1011, 1012 (S.D.N.Y.1982), the plaintiff never applied for the position which he claimed was discriminatorily denied him, he was thoroughly unqualified for the position, and the appointment was made for legitimate non-discriminatory reasons.

As the Second Circuit cautioned in *Faraci v. Hickey-Freeman Co., Inc., supra,* 607 F.2d at 1028,

> Recent legislation extending the power of the federal courts to award attorney's fees by no means requires abandonment of the equitable principles that have traditionally governed a court's discretion in such matters. On the contrary, the express grant of authority to award fees presumes continued application of equitable contradictions in appropriate cases, both to effectuate the broader legislative purpose and to do justice in the particular case.

(citations omitted). In this case, the equities tip in favor of Logan's status as a *pro se* civil rights plaintiff, with a *prima facie* claim which was ultimately not supportable on its facts.

In sum, Logan has failed to demonstrate that there are disputed issues of material fact, and has failed to show that her dismissal was the result of bias against her because of her race or age, entitling the defendants to summary judgment on the Title VII, Section 1981 and ADEA claims. Logan's Fourteenth Amendment claim suffers from a jurisdictional defect, and is therefore dismissed, and her ERISA claim is factually unfounded necessitating summary judgment for the defendants on the ERISA claim. Finally, as no independent basis of jurisdiction exists for the pendent state common-law claims, they are dismissed without prejudice.

IT IS SO ORDERED.