Fred SCOTT, Plaintiff,

v.

FEDERAL RESERVE BANK OF NEW YORK, Defendant.

No. 87 Civ. 9244 (RWS).

United States District Court,
S.D. New York.

Jan. 13, 1989.

C. Vernon Mason, New York City, for plaintiff.

Ernest T. Patrikis, (Thomas C. Baxter, Jr. and Jonathan I. Polk, of counsel), New York City, for defendant.

OPINION

SWEET, District Judge.

Defendant Federal Reserve Bank of New York (the "New York Fed") has moved for summary judgment under Rule 56, Fed.R. Civ.P., to dismiss the complaint of plaintiff Fred Scott ("Scott"), who has alleged that his discharge by the New York Fed consti-

tutes a violation of § 1983 of the Civil Rights Act of 1864 (42 U.S.C. § 1983), § 1981 of the same title, and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*). On the facts and conclusions set forth below, the New York Fed's motion is granted and the complaint will be dismissed with costs.

### Prior Proceedings

On July 25, 1986, Scott filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"). The charge alleged the New York Fed discriminated against Scott because of his race when it fired him. On September 25, 1987, the EEOC issued a notice of right to sue letter. The EEOC never reached a determination with respect to the merits of Scott's charge.

Scott's complaint was filed on December 28, 1987 and the New York Fed has deposed him. In his complaint, Scott raises certain "terms and conditions" claims that he did not raise in his EEOC charge, namely, that the New York Fed discriminated against him in promoting white employees with less seniority. In particular, Scott points to a caucasian's promotion to chauffeur, and another caucasian guard's promotion to special duties. Further, Scott claims that the New York Fed discriminated against him in failing to grant him "grade scale" increases, and finally in investigating grievances of discrimination and the procedure for filing such grievances.

The New York Fed has supported its motion for summary judgment with affidavits of William J. Kelly, Manager of the Protection Function ("Kelly"), James Coffey, Assistant Chief in the Personnel Function ("Coffey"), Carl Turnipseed, Assistant Vice President in the Foreign Relations Function ("Turnipseed"), Leo Smith, Guard ("Smith"), Robert V. Murray, Vice President of the Service Function ("Murray"), and Harold Lee, Captain of the Guard Force ("Lee") and the depositions of Scott and Gabriel Koz ("Dr. Koz"). In opposition, Scott has submitted his affidavit. Both parties have submitted statements under local Rule 3(g) ("3G Statements"). The

motion was argued and was considered fully submitted on October 26, 1988.

### The Facts

Scott is a 39 year old Black male who resides in Brooklyn, New York. New York Fed is a corporate instrumentality of the United States, organized and existing under federal law. It holds more than $200 billion dollars in gold, currency, and securities in its building at 33 Liberty Street, in New York City. New York Fed maintains a guard force of more than 100 persons.

Scott was hired by the New York Fed in May of 1973 as a computer messenger, worked as a messenger for about a year, and was rehired as a guard. In his capacity as a guard, he received a citation for outstanding service. In 1978, Mrs. Scott divorced Scott after an incident during which he beat her.

In 1981, Rene Talbert ("Talbert"), a female employee of the New York Fed, complained to John Manning, the Assistant Chief of the Protection Function, that Scott threatened to pistol whip her if she did not accept a date with him. Scott vehemently denied Talbert's charge when Manning confronted him with it, and the matter was dropped.

On a number of occasions, in 1984, a female employee of the New York Fed named Sarah accused Scott of being crazy. Scott complained about Sarah to his supervisor, who spoke to Sarah's supervisor, and the problems abated.

In April or May of 1984, Scott ordered Miss Brathway, a female employee of New York Fed, to stay out of the area where he worked with Leo Smith with whom Brathway was friendly. This led to an altercation between Scott and Smith. Prompted by a telephone call from Smith in which Smith referred to Scott as "crazy," Sergeant Rivers, a Black male supervisor on the guard force, interceded.

Later in 1984, another incident occurred between Scott and Smith. This took place on the New York Fed's minibus used to transport New York Fed employees who work the 4:00 p.m. to midnight shift (the shift on which Scott worked) to the Katz

Parking Garage, where the employees are provided with parking. Scott wanted the minibus to wait for one of his friends, who had gone back into the 33 Liberty Street building to retrieve a forgotten item. This led to an argument between Scott and Smith, and Smith says that Scott threatened to "get" him. Scott denies threatening Smith.

In August of 1985, an incident occurred between Scott and a Hispanic chauffeur named Cartagena in the trucking area of the 33 Liberty Street building involving Scott being annoyed by Cartagena's handling of his vehicle while Scott was directing traffic. This incident involved nothing more than harsh words, although Scott recalls that Cartagena called him crazy. Subsequently, there was another incident involving Smith that occurred in the trucking area, where, according to Smith, Scott said that he was going to "get" Smith.

On August 22, 1985 a caucasian guard, Kollar, was promoted to Special Duty Guard after four years of employment with the New York Fed. He had also completed 20 years service as a New York City Transit Police Officer. Scott did not apply for the position.

In November of 1985, there was an announcement to the guard force that some of the guards would receive a "President's Award," a special lump-sum cash award for outstanding performance. It was reported to management that when Scott heard about this program, he characterized the recipients of the President's Award as "backstabbers."

In early December of 1985, Captain Chappas, who headed the guard force, directed all guards working on the 4:00 p.m. to midnight shift to report for duty two hours early on December 18, 1985 in order to attend a training course introducing the guards to new uniforms and weapons. Scott slept late and failed to attend.

Scott was directed to attend a make-up session on January 6, 1986 by Freddy Gist ("Gist"), a Black Lieutenant working on the 4:00 p.m. to midnight shift. Once again, Scott failed to attend the make-up session. When Gist confronted him on the telephone

and asked him what happened, Scott hung up. Scott did not remember hanging up on Gist, but recalled telling Gist that he was not at the make-up because he was shopping.

On January 14, 1986, there was an incident between Scott and Rosario, another guard, in the trucking area. According to a report of the incident prepared by Lieutenant Gist, the incident occurred when Scott refused to alternate positions with Rosario, although Scott remembers this differently, for he remembered that Rosario had been intransigent, and not him. The two men argued, and Gist was called to intervene. When Gist arrived, he heard Scott accuse Rosario of consuming alcoholic beverages on the job, which is a violation of New York Fed work rules.

On January 27, 1986, there was an incident in the guard's locker room. Scott was playing music while other guards were playing cards. One of the other guards apparently believed that Scott's music was too loud, and he asked Scott to turn it down. This led to an altercation between the two men, and Lee was called to intercede. Lee is Black and now heads the guard force, having replaced Chappas. Lee reported that when he arrived on the scene, he was told by a guard named Papajohn that Scott was "a time bomb waiting to go off." He also said that Scott proclaimed that "I know the game plan and you're all going to get yours." Scott claims that the incident was not his fault, but admits that he was referred to as "crazy."

During this period, Ficarra, a caucasian guard, inadvertently discharged a weapon indoors during a general alarm. Three other caucasian guards received counselling. One had his pistol permit suspended. None were returned to guard duty until after receiving a favorable recommendation with respect to their emotional stability.

Management of the Protection Function became concerned about Scott because his duties required him to be armed and reports indicated that Scott had become increasingly insular, withdrawn, and insubordinate with respect to the directions of his

supervisors. In addition were the series of altercations involving Scott and his fellow guards, some of which required supervisors to be called to intercede. In addition, Scott's colleagues were openly referring to him as a "crazy" person.

In late January of 1986, management of the Protection Function and Gervasio met with representatives of the Personnel Function to discuss Scott. The New York Fed's Medical Director, Dr. Jack Osterritter ("Dr. Osterritter"), also attended this meeting. A decision was made to ask Scott to see a representative of the Employee Assistance Program ("EAP"). EAP is an independent entity that the New York Fed and other employers in the New York metropolitan area use to provide psychological and other types of counselling to employees.

After appropriate arrangements were made with EAP, Scott was asked to interview with an EAP representative. Although initially reluctant, Scott agreed to the interview. Scott was interviewed by Michael Selwyn of EAP, who, after the appropriate client consent forms were executed by Scott, communicated his opinion to Dr. Osterritter.

Dr. Osterritter then informed Kelly, then Manager of the Protection Function (the corporate officer responsible for the guard force) that EAP was concerned about Scott's mental condition, and recommended that Scott be seen by a psychiatrist specializing in the treatment of individuals who carry weapons. Kelly telephoned a Deputy Inspector of the New York City Police Department and asked for the names of psychiatrists that the Department uses in similar situations. He was provided with the names of two psychiatrists, one of whom was Dr. Gabriel Koz. Kelly passed both names to Dr. Osterritter, who, in turn, passed them along to Selwyn at EAP.

Dr. Koz is a physician licensed to practice medicine and surgery in New York State, the United Kingdom, and South Africa. He is certified in Administrative Psychiatry by the American Psychiatric Association and is presently the head of the Department of Psychiatry at Woodhull Hospital in the Bronx. Dr. Koz serves as a consultant to the New York City Police Department on psychiatric matters.

The two names from the New York City Police Department were offered to Scott, and he decided to see Dr. Koz. Dr. Koz interviewed Scott on two occasions. On the first occasion, according to Scott, Dr. Koz told him that his opinion was that Scott "was not crazy." On the second occasion, Scott testified Dr. Koz told Scott that: "the Bank wanted him [Dr. Koz] to say I was crazy, but he cannot say that." Dr. Koz also spoke to Selwyn and Scaffa about Scott, as well as to Dr. Osterritter.

Dr. Koz concluded that Scott had a "schizoid personality," which he defined as "a somewhat withdrawn isolated type of individual who has difficulty functioning in social and occupational areas." Dr. Koz recommended to the New York Fed that Scott "should not have firearms for a period of at least six months to a year." This recommendation was communicated to the New York Fed in a letter dated March 11, 1986, addressed to Dr. Osterritter.

After Dr. Koz's opinion and recommendation was evaluated, the New York Fed made a decision that Scott could not return to the guard force until his mental health was restored. Captain Lee, a Black man and Captain of the New York Fed Guard Force, has served for 20 years in the United States Army before joining the New York Fed and is a combat veteran of the Korean and Vietnam wars. When in the United States Army, he was responsible for assessing the suitability of men for combat. This experienced veteran has stated his evaluation of Scott as follows:

> In my opinion, Mr. Scott was not well suited for a guard position. He was tense, on edge, and subject to sudden outbursts of temper. He had an unpredictable nature that led me to believe he could not be relied upon to use his firearm responsibly.

Because Scott was fully able to work, albeit not in a position where he would be carrying a weapon, Coffey of the Personnel Function was instructed to find him a suitable alternative position at an equivalent

salary in the New York Fed's Check Processing Function. Because Scott had not been reporting for work during this process, Coffey began to leave messages on his telephone answering machine that Scott should call Coffey. When Scott returned Coffey's calls, Coffey told him of the alternative position in the New York Fed's Check Processing Department.

Scott refused to accept this alternative position, and demanded that Coffey explain to Scott why he could not have his old job back. Coffey then prepared a mailgram for Mr. Myrie's signature, which directed Scott to contact the New York Fed immediately regarding his continuing employment. The mailgram was sent and received by Scott on April 14, 1986. Scott did not respond to it.

Several days later, when he had heard nothing from Scott, Coffey conferred with representatives of EAP. They advised Coffey, at this point, not to treat Scott any differently than other employees of the New York Fed. Accordingly, Coffey recommended that Scott's name "be removed from the rolls of the Bank for abandoning his position."

Coffey's recommendation was transmitted to Turnipseed, who at that time was Assistant Vice President in charge of the Personnel Function and to Ms. Evelyn Kender ("Kender"), who was then (and is now) the Manager (a lower level official position). Turnipseed, who is Black, and Kender, who is white, approved of the Coffey recommendation, jointly indicating their opinion that "the employee has abandoned the job and resigned." Lennox Myrie, then the chief of the Personnel Services Division of the Personnel Function (who is now an officer in another Function and who is Black) concurred in this Personnel action, as did the Protection Function.

On April 22, 1986, Coffey wrote to Scott and advised him that the New York Fed considered Scott to have abandoned his position and that such action "constitutes a voluntary termination of employment from the Bank." Scott was replaced by Pedro Williams who is Black. Scott received the April 22 letter.

Grade scale increases are granted to the New York Fed's employees once a year, in early July. Because the employment relationship with Scott was severed in April of 1986, the last grade scale increase for which he was eligible occurred on July 1, 1985. With respect to grade scale increases on July 1, 1985 and July 1, 1984, Scott received exactly the same increase as other guards who were not on corrective for performance at the time.

Various caucasian guards were required to undergo counselling, but nonetheless were allowed to return to active guard duty. One whose pistol permit was suspended was allowed to return to active guard duty after having undergone psychiatric treatment and the permit was reinstated. Another guard took medical leave for approximately 58 days, sought psychiatric help and when he returned to work asked to be reassigned to an area that involved less stress than his former position. A third guard was referred in September of 1985 to the EAP after he got into a fight with another guard. The EAP assured the New York Fed that the guard was emotionally stable before he was allowed to return to active duty. No recommendation for psychiatric evaluation was made. Other than this one incident the guard has a clean record.

The New York Fed has an internal procedure for processing complaints of racial discrimination. Scott last used the New York Fed's internal grievance procedure in 1976.

## CONCLUSIONS

### The Propriety of Summary Judgment

To defeat a motion for summary judgment, an adverse party needs to submit competent affidavits which dispute issues of fact that are material to a resolution of the legal claims. *See, e.g., Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805 (2d Cir.1987). In the context of a race discrimination case, where the fundamental issue is generally one concerning the state of mind of an employer's agent, summary judgment is frequently inappropriate because com-

monly there are competing inferences regarding discriminatory animus. *See, e.g., DeCintio v. Westchester County Medical Center,* 821 F.2d 111 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987) (reversing summary judgment in a Title VII retaliation case where the plaintiff introduced evidence that fellow employees "were not disciplined for engaging in identical behavior").

However, "state of mind" is not a talisman that may merely be invoked but is an "exception" that must be established. *Clements v. County of Nassau,* 835 F.2d 1000, 1005 (2d Cir.1987). To invoke the exception, an adverse party must come forward with "solid circumstantial [or direct] evidence" with respect to racial animus which is sufficient to warrant presentation of competing inferences to the trier of fact for resolution. *Id.* The existence of competing inferences is determinative because the task of weighing such inferences "remains within the province of the fact finder at trial." *Belfiore v. The New York Times Co.,* 826 F.2d 177, 180 (2d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988). Several decisions of the Court of Appeals for the Second Circuit, including *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54 (2d Cir.1987), *DeCintio,* 821 F.2d at 111, *Murray v. Xerox Corp.,* 811 F.2d 118 (2d Cir.1987) and *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184 (2d Cir.1987), point out the difficulty determining whether or not the evidence presented on summary judgment applications rises to the level of a material factual issue.

It is first necessary to refine Scott's claims, because in every case "whether facts are material will be determined by substantive law." *Wright v. Cayan,* 817 F.2d 999, 1002 (2d Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986)).

In *Gomez v. Toledo,* the United States Supreme Court indicated that two basic allegations are required to state a claim for relief under § 1983:

1. that some person has deprived the plaintiff of a federal right; and

2. that the person who deprived the plaintiff of that federal right acted "under color of state or territorial law."

446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980); *accord Annunziato v. The Gan, Inc.,* 744 F.2d 244, 249–50 (2d Cir.1984).

■ Scott does not state a § 1983 claim against the New York Fed because it does not act "under color of state law." The meaning of this critical element of the § 1983 claim was described by the Second Circuit in *Annunziato:*

Acting under color of state law is defined as the "[m]isuse of power, *possessed by virtue of state law* and made possible only because the wrongdoer is clothed with the authority of state law."

744 F.2d at 250 (*quoting United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) (emphasis added)).

The New York Fed is a corporate instrumentality of the United States, *Federal Reserve Bank of St. Louis v. Metrocentre Improvement District # 1,* 657 F.2d 183 (8th Cir.1981), *aff'd,* 455 U.S. 995, 102 S.Ct. 1625, 71 L.Ed.2d 857 (1982); *Federal Reserve Bank of Boston v. Comm'r of Corporations and Taxation,* 499 F.2d 60 (1st Cir.1974). It was chartered by the Comptroller of the Currency under the Federal Reserve Act, and derives its broad banking powers from Sections 4, 13, 14 and 16 of the Federal Reserve Act (12 U.S.C. §§ 341, 342–346, 372, 347, 373, 348–52, 353–359, 348a, 359a, and 360), and from certain other sections of federal law. The most significant source of the New York Fed's supervisory powers over certain other banking institutions is Section 11 of the Federal Reserve Act, which confers such authority on the Board of Governors of the Federal Reserve System but which authorizes the Board:

[t]o delegate, by published order or rule and subject to the Administrative Proce-

dure Act, any of its functions ... to one or more hearing examiners, members or employees of the Board, or Federal Reserve Banks.

12 U.S.C. § 248(k).

Thus, the New York Fed derives its authority to act from federal law, not state law. In this regard, the New York Court of Appeals, in interpreting state law, has held that New York State courts lack the power to compel the New York Fed, as an instrumentality of the United States, to take any action whatsoever. *Armand Schmoll, Inc. v. Federal Reserve Bank of New York,* 286 N.Y. 503, 506, 37 N.E.2d 225 (1941), *cert. denied,* 315 U.S. 818, 62 S.Ct. 905, 86 L.Ed. 1215 (1942).

Further, § 1983 will not ordinarily provide a basis for liability against a private corporation unless it can be shown that the conduct of such a private corporation is the functional equivalent of state action. *See, e.g., Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 928, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982); *Rendell–Baker v. Kohn,* 457 U.S. 830, 840, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982).

The New York Fed receives no state funds, it is subject to no state regulation, and it performs no function that may properly be regarded as the traditional and exclusive function of the state. In sum, there is no state action in this case, and there can be no "legally sufficient" § 1983 claim.

Section 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right ... *to make and enforce contracts* ... as is enjoyed by white citizens.

42 U.S.C. § 1981 (emphasis added).

To establish a "legally sufficient" claim under § 1981, a plaintiff "must show both that he was subjected to intentional discrimination, and that the discrimination interfered with a contractual relationship." *Murray v. National Broadcasting Co.,* 844 F.2d 988, 995 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988) (*quoting Krulik v. Board of Education,* 781 F.2d 15, 23 (2d Cir.1986)). To be legally sufficient, Scott must show that

there is "a contract right underlying [his § 1981] claim." *Murray,* 844 F.2d at 995.

■ Employees of the New York Fed do not have an express contractual right to their employment. Section 4 of the Federal Reserve Act enumerates the basic powers of all Federal Reserve Banks, and it expressly provides that:

a Federal Reserve Bank ... shall have power ... [t]o appoint by its board of directors a president, vice presidents, and such officers and employees as are not otherwise provided for in this Chapter, to define their duties, require bonds for them and fix the penalty thereof, and *to dismiss at pleasure such officers and employees.*

12 U.S.C. § 341, Fifth (emphasis added).

The words "at pleasure" have been interpreted to mean that no officer or employee of a Federal Reserve Bank has any enforceable contract or other property right to his or her employment. *See, e.g., Bollow v. Federal Reserve Bank,* 650 F.2d 1093 (9th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982); *Jaffe v. Federal Reserve Bank,* 586 F.Supp. 106 (N.D.Ill.1984); *Obradovich v. Federal Reserve Bank,* 569 F.Supp. 785 (S.D.N.Y.1983) (Weinfeld, J.); *Armano v. Federal Reserve Bank of Boston,* 468 F.Supp. 674 (D.C.Mass.1979). As the Court in *Jaffe* succinctly summarized the principle, the statute "prevents the development of any reasonable expectation of continued employment." 586 F.Supp. at 107.

■ Notwithstanding these authorities, Magistrate Nina Gershon on September 8, 1988 in a Report and Recommendation in *Harding v. Federal Reserve Bank of New York,* No. 81 Civ. 6760 (RO), reached a well reasoned conclusion that 12 U.S.C. § 341 does not shield the New York Fed from liability under § 1981, relying principally on the implicit assumption of liability in *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) and analogous cited authorities with respect to "at will" employment. Although Magistrate Gershon's Report and Recommendation has yet to be

adopted by the Honorable Richard Owen, it is relied upon here in concluding that Scott has properly alleged a § 1981 claim.

However, a claim for relief under § 1981 provides no greater protection against discriminatory employment practices than Title VII, and the elements and the allocation of the burdens of proof are the same under the two statutes. *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 44 (2d Cir.1984); *accord, Simpson v. Consolidated Edison of New York, Inc.,* 1988 U.S. Dist.Lexis 4355 (S.D.N.Y.1988) [1988 WL 49039]; *Eshun v. New York State Dept. of Social Servs.,* 652 F.Supp. 455, 459 (S.D.N.Y.1987); *Grant v. Morgan Guaranty Trust Co.,* 638 F.Supp. 1528, 1536 n. 10 (S.D.N.Y.1986). Thus, it is appropriate to consider the § 1981 and Title VII claims together with respect to the conclusions which follow.

Section 703 of the Civil Rights Act of 1964 provides that:

> It shall be an unlawful employment practice for an employer—
>
> > (1) to fail or refuse to hire or to *discharge any individual or otherwise to discriminate* against any individual *with respect to* his compensation, *terms, conditions,* or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...

42 U.S.C. § 2000e–2(a) (emphasis added).

Scott's complaint alleges two claims falling within the purview of the above quoted provision of Title VII: (1) discriminatory constructive discharge and (2) "terms and conditions" discrimination. For the sake of argument, the New York Fed is willing to assume that Scott was constructively discharged.

In his EEOC charge, Scott claimed that he experienced discrimination by reason of the severance of the employment relationship; nothing was ever said about any "terms and conditions" discrimination. Because the "type and character" of the two forms of alleged discrimination differ, this claim could be considered legally insufficient because it was not raised in the first instance with the EEOC. *See, e.g., Flesch*

*v. Eastern Pennsylvania Psychiatric Institute,* 434 F.Supp. 963, 970 (E.D.Pa.1977). However, the New York Fed has not pressed this technical defense. What remains then is an evaluation as to whether Scott has adduced sufficient evidence to raise a factual issue to defeat the motion of the New York Fed.

*A Prima Facie Case Has Not Been Established*

The burden and order of proof in a Title VII case consists of three basic parts. First, the plaintiff must prove a so-called *prima facie* case of discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Second, if the plaintiff succeeds in establishing a *prima facie* case of employment discrimination, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the conduct in issue. *Texas Department,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. Third, if the defendant produces evidence sufficient to raise a genuine issue of fact as to whether its conduct was motivated by a "legitimate non-discriminatory reason," then the plaintiff must carry a final burden of persuading the trier of fact that the proffered reason of the defendant is pretextual, or unworthy of credence. *Id.* at 256, 101 S.Ct. at 1095.

In *Logan v. St. Luke's–Roosevelt Hospital Center,* this court enunciated the plaintiff's *prima facie* burden in the context of a discriminatory discharge case. 636 F.Supp. 226, 233 (S.D.N.Y.), *aff'd,* 805 F.2d 391 (1986). In paraphrasing the *McDonnell Douglas* formulation, the court said that the plaintiff must establish the following five elements:

1. [that] she is a member of a racial minority;

2. that she was qualified for the job she was performing;

3. that she satisfied the normal requirements for her work;

4. that she was discharged; and

5. after her termination, a white employee was assigned to do the same work.

636 F.Supp. at 233; *accord, Meiri v. Dacon,* 759 F.2d at 995; *Thermidor v. Beth Israel Medical Center,* 683 F.Supp. 403, 408–09 (S.D.N.Y.1988); *Grant v. Pfizer, Inc.,* 683 F.Supp. 41, 43 (S.D.N.Y.1988); *Eshun v. New York State Dep't of Social Servs.,* 652 F.Supp. 455, 460 (S.D.N.Y. 1987).

■ Scott has adduced no evidence to establish the fifth element because he was replaced by another Black male. *Jones v. Lumberjack Meats, Inc.,* 680 F.2d 98, 101 (11th Cir.1982); *Powell v. Syracuse University,* 580 F.2d 1150, 1156 (2d Cir.1978). No other evidence to support an inference of discrimination has been adduced. Thus, Scott cannot establish a *prima facie* case, and the New York Fed's motion for summary judgment must be granted.

### There Was a Reason for the Discharge

Although Scott's account of the various incidents that prompted the psychiatric evaluation differs in some degree from the description of the events described by the New York Fed, the occurrence of the incidents is not disputed by Scott. He also concedes that some of his colleagues were complaining about his behavior, and that some were questioning his "sanity."

Dr. Koz, a recognized authority with respect to the circumstances when an employee should no longer be permitted to carry a weapon, opined that Scott's weapon privileges should be temporarily revoked. That opinion constituted a legitimate non-discriminatory reason for personnel action. To meet the clear implication of the opinion of Dr. Koz, Scott has alleged that someone at the New York Fed asked Dr. Koz to say that Scott was crazy. Even if the supposed communication between Dr. Koz and the New York Fed is accepted as circumstantial evidence of the declarant's predisposition against Scott, there is not a scintilla of evidence that this predisposition was motivated by Scott's race, or was shared by the decision makers, Murray and Kelly.

Most significantly, Scott made no effort to substantiate his naked assertion when offered the opportunity to do so at Dr. Koz's deposition. His assertion fails to raise a material issue of fact to support his burden to establish that the New York Fed's reliance on Dr. Koz's opinion was pretextual and motivated by discrimination. Indeed the deposition of Dr. Koz reveals no hint of such a motivation.

In his deposition testimony, Scott stated that he was unwilling to discuss alternative positions with Coffey of the New York Fed's Personnel Department until he had received an explanation as to what Dr. Koz had said about him. Coffey did not respond to this demand nor was he obligated to do so. Scott did not pursue his request at the deposition of Dr. Koz.

The treatment of the caucasian guards with psychological problems set forth above fails to raise an inference that the recommendation by EAP or Dr. Koz was racially motivated or the action taken by the New York Fed on their recommendations was pretextual. The successful reference of a white employee to a psychological assistance program does not establish that the reference or the program is pretextual. This is particularly so when, as here, the circumstances giving rise to the reference are significantly different from those in Scott's case.

Thus, Scott has not presented a factual issue with respect to pretext. In fact, the offer to Scott of alternative employment at an equivalent salary destroys any implication of pretext under these circumstances. Scott's determination to turn down the New York Fed's position in Check Processing was ill-advised in the extreme, especially in view of the failure to make out even a *prima facie* case.

### Discrimination in the Terms and Conditions of Employment

Title VII requires a plaintiff complaining of an alleged discriminatory employment practice to file a charge with the EEOC within 300 days after the alleged act occurred. 42 U.S.C. § 2000e–5(e). *See, e.g., Mohasco Corp. v. Silver,* 447 U.S. 807, 817, 100 S.Ct. 2486, 2492, 65 L.Ed.2d 532 (1980);

*Thompson v. Board of Educ. of the City of New York,* 1988 U.S.Dist.Lexis 2692 (S.D.N.Y.1988) [1988 WL 34811].

To ascertain whether a plaintiff has timely commenced litigation regarding a particular employment practice, it is essential "to identify precisely the 'unlawful employment practice' of which [the plaintiff] complains." *Cook v. Pan American World Airways, Inc.,* 771 F.2d 635, 645 (2d Cir. 1985), *cert. denied,* 474 U.S. 1109, 106 S.Ct. 895, 88 L.Ed.2d 929 (1986) (*quoting Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980)). In this regard, the United States Supreme Court has instructed that it is the time of the allegedly discriminatory act, and not the time when an individual feels the effect of that act, that is determinative of the limitations inquiry. *Delaware State College,* 449 U.S. at 257, 101 S.Ct. at 503; *accord, Miller v. Int'l Tel. & Tel. Corp.,* 755 F.2d 20, 23 (2d Cir.), *cert. denied,* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); *O'Malley v. GTE Service Corp.,* 758 F.2d 818, 820 (2d Cir.1985).

With respect to Scott's first "terms and conditions" allegation—that the New York Fed discriminated against him in promoting white employees with less seniority than black employees—the alleged act falls outside the 300–day period preceding the filing of his EEOC charge and is time barred. At issue is the promotion of Guard Kollar on August 22, 1985. Because Scott filed his charge with the EEOC on July 25, 1986, more than 300 days after Kollar's promotion, the promotion claim is time-barred.

With respect to Scott's second "terms and conditions" allegations—that the New York Fed discriminated against him in grade scale increases—this alleged act also falls outside the 300–day period. The last grade scale increase for which Scott was eligible was July 1, 1985 which was more than 300 days before Scott filed his charge with the EEOC. Thus, the claim is also time barred.

With respect to Scott's third and fourth "terms and conditions" allegations—that the New York Fed did not investigate and correct certain unspecified discriminatory practices and did not have adequate procedures for investigating such complaints— the New York Fed has an internal procedure for processing complaints of racial discrimination. Scott last complained of discrimination internally in 1976. Obviously, that date falls outside of the 300 day period.

■  Because all of Scott's "terms and conditions" allegations concern acts which occurred outside of the 300 day period, they are time barred unless Scott can take advantage of the so-called "continuing violation" exception to the limitations rule. To take advantage of this limited exception, a plaintiff must demonstrate:

> a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period.

*Drayton v. Veterans Administration,* 654 F.Supp. 558, 567 (S.D.N.Y.1987), *quoting Valentino v. United States Postal Serv.,* 674 F.2d 56, 65 (D.C.Cir.1982) (*quoting* B. Schlei & P. Grossman, *Employment Discrimination Law* 232 (1983)).

Scott has not invoked the continuing violation exception in either his EEOC charge or his complaint. This is a fatal procedural flaw, because in this Circuit the continuing violation exception must be asserted clearly "both in the EEOC charge and in the complaint." *Cook v. Pan American,* 771 F.2d at 646; *Miller v. Int'l Tel.,* 755 F.2d at 26.

As for the substance of such a continuing violation exception, its most distinguishing characteristic is the relatedness of the discriminatory acts. *Drayton,* 654 F.Supp. at 567. In any case, Scott's "terms and conditions" claims are not sufficiently related to the severance claim to warrant an invocation of the continuing violation exception.

First, none of the individuals responsible for the acts comprising the "terms and conditions" claims are responsible for the acts comprising the "severance" claim. The decision to discharge Scott was made by four individuals in the New York Fed's Personnel Function, while the decisions to

take the various actions which give rise to the "terms and conditions" claims were all made by the management of the Protection Function.

Second, the "severance" decision was made by the Personnel Function, which is located in an office building known as 59 Maiden Lane. The Protection Function, which was responsible for the acts forming the basis for the "terms and conditions" allegations, is located in the building at 33 Liberty Street.

Finally, unlike the situation with respect to the acts forming the basis for the "terms and conditions" allegations, Scott controlled the severance of the employment relationship. He cannot fairly attribute that decision to anyone at the New York Fed, because he brought termination on himself.

Since the alleged act of discrimination which falls within the 300 day period is unrelated to the alleged acts of discrimination which fall outside of the 300 day period, the continuing violation exception does not apply.

Based on the facts found above and the conclusions stated, the New York Fed's motion for summary judgment is granted, with costs. Submit judgment on notice.

It is so ordered.