**David KRULIK, Plaintiff-Appellant,**

v.

**BOARD OF EDUCATION OF the CITY OF NEW YORK, Defendant-Appellee.**

**No. 129, Docket 85–7409.**

United States Court of Appeals, Second Circuit.

Argued Oct. 10, 1985.

Decided Jan. 6, 1986.

---

**4.** We are not suggesting that Carib was not a completely independent corporation. This is merely an *arguendo*.

J. Robert Kirk, Washington, D.C. (Lawrence Z. Lorber, Stephen L. Samuels, Breed, Abbott & Morgan, Washington, D.C., of counsel), for plaintiff-appellant.

Helen P. Brown, Asst. Corp. Counsel, New York City (Frederick A.O. Schwarz, Jr., Corp. Counsel of the City of New York, June A. Witterschein, Asst. Corp. Counsel, of counsel), for defendant-appellee.

Before LUMBARD, VAN GRAAFEILAND and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Plaintiff David Krulik appeals from an April 11, 1985, order of the Eastern District, granting the defendant Board of Education's motion for a judgment notwithstanding the verdict ("judgment n.o.v.") disposing of Krulik's claims under 42 U.S.C. §§ 1981 and 1983. Krulik also appeals Judge Bartels's order of April 23, 1985, which denied Krulik's claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* Finally, Krulik appeals Judge Bartels's dismissal after trial of Krulik's pendent state claim for constructive discharge.

Krulik argues, first, that ample evidence supported the jury's finding that the Board

had intentionally discriminated against him, and therefore that Judge Bartels erred in setting aside the verdict and the jury's award of $275,000 in damages. Second, Krulik argues that, because the jury's verdict was not a "miscarriage of justice," the district court's grant of a new trial in the event that this court reverses the judgment n.o.v. was an abuse of discretion and should be reversed. Krulik also argues that, assuming the jury's finding of intentional discrimination is reinstated, the seventh amendment requires us to reverse Judge Bartels's denial of the Title VII claim. Finally, Krulik argues in the alternative that the constructive discharge claim should be remanded for a new trial, on the ground that Judge Bartels's dismissal was based on the erroneous finding that Krulik had no contractual rights in his job. Because we agree with the district court that Krulik failed to make even a minimally adequate showing of discrimination on the basis of his race or religion, we affirm the court's judgment in all respects.

Krulik, who is white and Jewish, began his career in education in 1951. For the nineteen years following, he held a variety of teaching and administrative positions in the public schools. In 1970, after Krulik had placed first in the Board's English as a Second Language ("ESL") licensing examination, he was appointed Assistant Director of the Bureau of English in charge of the ESL programs in the public schools. New York Civil Service Law §§ 51 and 61 gave the Board the discretion to choose the Assistant Director from among the three top finishers on the licensing examination. The Board originally had offered the position to Irma Fuentes, who had finished second; she had turned it down, however.

Krulik's appointment as head of ESL was opposed by a private organization of teachers and supervisors known as the Puerto Rican Educators Association ("PREA"), whose members included Nathan Quinones and Awilda Orta—the two persons who Krulik claims are principally responsible for his allegedly discriminatory treatment. In a letter to the Board dated March 3, 1970, the PREA argued that Clelia Belfrom, an Italian-American woman who was the acting Assistant Director (and third-place finisher on the licensing exam), deserved the appointment over Krulik. The letter noted that Belfrom had already served in the position for three years, and that her sensitivity and effectiveness had gained her the confidence of the Puerto Rican community. There is no suggestion in the letter, nor is there any circumstantial evidence to show, that the PREA considered Krulik unacceptable because he was white, Jewish, and/or non-Puerto Rican; indeed, Belfrom (the preferred candidate) was herself white and Italian. Further, Orta and Quinones both testified at trial that they signed the letter because they believed Krulik to be inferior on the merits, and not because of Krulik's ethnic background.

In 1973, when Krulik was serving as Assistant Director of the Bureau of English in charge of ESL, the Board created a new Center for Bilingual Education, which was to be headed by Herman LaFontaine. LaFontaine would report to the head of the Division of Educational Planning who, in turn, would report to the Chancellor. The position below LaFontaine's was that of Deputy Center Administrator, and below that were ten units, each on the same level of hierarchy. Krulik was the head of the ESL unit, which was one of the ten. In 1979, Orta replaced LaFontaine as the Administrator of the Center for Bilingual Education.

*Reorganization of the Center*—In March, 1979, then-Chancellor Macchiarola elevated the Center in the Board's hierarchy, and renamed it the Office of Bilingual Education ("OBE")—a change that led to the first allegedly discriminatory event. Following its elevation, the new OBE would report directly to the Chancellor, and no longer to the Division of Educational Planning. The OBE's expanded scope, which was partially the result of court orders imposing new responsibilities for bilingual education, necessitated a reorganization of the Center's previous structure. Orta invited the entire OBE staff to attend

planning meetings to develop a Comprehensive Reorganization Plan. In order to familiarize herself with the OBE staff, at the first meeting Orta asked all staff members (including secretaries and clerks) to fill out and submit a form describing their experience and background. Instead of filling out the form, Krulik attached a copy of his resume to it and returned it to Orta. Between March and July, 1979, Orta held meetings with the Unit Heads to discuss the office structure that would respond best to the needs of the children served by OBE. Krulik attended several of these meetings.

According to the Comprehensive Plan, five new centers were to be created within the OBE: Curriculum Development, Dissemination, Staff Development, Program Planning and Implementation, and Assessment and Evaluation. The new managerial structure would consist of a Director, two Deputy Directors, five Center Directors, and various Unit Directors. In the summer of 1979, Orta began to fill the Deputy Director and Center Director positions on an interim basis. Because service in an interim position lasts only during the Board's audit of the position, the application process is often informal. Accordingly, the persons selected for the interim Center Director positions in the summer of 1979 either had spoken to or written to Orta expressing their interest, or had been recruited by Orta. Krulik was not promoted from his Unit Head position.

Orta testified that she really didn't think that Krulik was interested in any of the new positions, because he didn't approach her over the summer of 1979. Krulik testified that he believed he had applied when he attached his resume to the form distributed in March, and that he was shocked, upon his return from summer vacation in 1979, to find that all the interim positions had been filled. He testified that, whether or not he had actually "applied" for the new positions, they should have been offered to him out of "courtesy"—and that Orta's failure to do so was discriminatory. In this regard, Krulik noted that, of the seven appointees, all but one were Hispanic, and he asserted—without offering any proof—that he was more qualified than any of them. The Board presented evidence, however, that all seven appointees were very experienced in the area of bilingual education (which was to be the OBE's main mandate), whereas Krulik's experience was primarily in ESL (a narrower area). Further, the Board demonstrated that none of Krulik's several licenses related specifically to bilingual education. Finally, the Board showed that Krulik was only one of seven Unit Heads who were not promoted in the new OBE, and that of these seven, five were Hispanic.

*Staff Transfer*—The second allegedly discriminatory employment practice involving Krulik took place in 1980. From 1970 to 1980, Krulik had acquired a staff of eight teacher trainers and two secretaries, all of whom were employees of the Division of High Schools, a separate administrative unit of the Board of Education. After two management audits in 1979–80, one of which was conducted by Lewis Weissman (who is Jewish), the Division decided to transfer this high school ESL staff back to the Division. Both audits had concluded that, because Krulik was an OBE employee on the New York City payroll, his supervision of the federally-funded Division of High School staff members was an unauthorized use of federal funds, and created fragmented organizational structure within the ESL unit and unclear lines of authority.

When the transfer was originally announced in early 1979, Krulik requested of Nathan Quinones, then Director of the Division of High Schools, that he be allowed to transfer along with his staff. Quinones agreed. In March of 1979, however, Orta (then newly-appointed Director of OBE) convinced Quinones to delay the staff transfer until OBE had been reorganized. Krulik supported Orta in her efforts to retain the Division staff within OBE. In April, 1980, he sent Macchiarola a letter to this effect, but did not renew his request that he transfer along with the staff if they did go. Several days later, Quinones finally decided to transfer the high school ESL

unit to the Division; because Krulik was an employee of OBE, he was not automatically transferred with the unit and instead remained with OBE. The Division created a new Bilingual/ESL unit from among Krulik's former staff.

Krulik claims that the failure to transfer him along with his staff was discriminatory. He testified that he had orally renewed his transfer request to Quinones late in 1979, and that Quinones had said that he was going to "put in his own person." This person turned out to be Roberto Negron, a Puerto Rican, whom Orta had suggested as interim Unit Head. Krulik claims, without specific reasons, that Negron was unqualified. The Board showed, first, that Krulik had failed to apply for the transfer formally or to obtain the necessary approvals, and that everyone assumed that he wanted to stay with the ESL unit within OBE. Indeed, after the transfer was completed, Krulik did not complain, but instead requested new staff at ESL. Further, the Board showed that Negron had a B.A., Masters, State Certification, and broad experience in ESL and in bilingual education. When Negron left the interim position in December, 1980, he was replaced by Eli Plotkin, who is Jewish.

Krulik testified that without his staff he had nothing to do and felt isolated. The evidence showed, however, that his ESL duties remained the same after the reorganization and that he continued to perform them. In September, 1981, Krulik met with Chancellor Macchiarola to discuss his unhappiness with his working conditions. Macchiarola testified that Krulik's main problem was his relationship with Awilda Orta, who continued to be his supervisor. As a result of that meeting, Krulik was transferred, in December, 1981, to the Division of High Schools at 188 Houston Street in Manhattan. At the Division, Krulik focused his attention on ESL for the grades 9–12, instead of his previous focus on K–12; in doing so, he took over part of Plotkin's former duties.

Krulik testified that, after his transfer, he was unhappy because his job lacked "clarification." The evidence showed, however, that an assistant of Quinones had provided Krulik with a written explanation of his duties, and that these details had been cleared with Krulik's attorney. In addition, Krulik had met with Dr. Nancy Scott, his supervisor at the Division, to discuss his new responsibilities. Furthermore, Krulik chose not to apply for the Program Manager job that Plotkin had held on an interim basis; he testified that it paid less than the position he already held, and that "[he'd] be stupid to apply for a job that pays less than [he was] making." In September, 1982, Plotkin received the permanent appointment. Despite all of this evidence, Krulik claimed that the degradation he felt because of his "unclarified" position at the Division caused a deterioration in his health, with the result that he suffered a heart attack in 1983.

*Post-Heart Attack Working Conditions* —Plaintiff took a two-month leave of absence after his heart attack, and during that period the Division of High Schools moved to another location, the fifth floor of the Bay Ridge Annex. While out sick, Krulik expressed an interest in returning to work, and wrote two letters to Scott, requesting an office on the first or second floor of the Annex. She did not respond in writing to this request, but testified that she had told Quintanilla, the acting Program Manager, that no space was available to the Division on the first two floors. She testified that she assumed Quintanilla had passed this information on to Krulik, with whom Quintanilla was in frequent contact, and that she believed that Krulik's continuing letters to her on the subject were a form of harassment. Quintanilla denied ever talking to Scott about Krulik's office request, but corroborated her testimony that no space was available on the first and second floors. Krulik retired, at the age of 61, on September 1, 1983, allegedly because he could not work on the fifth floor; evidence showed, however, that had begun talking about retiring as far back as 1977, when he reached age 55.

Krulik initiated grievance proceedings with his union, and filed administrative actions in the New York State Division of Human Rights and with the United States EEOC. In November, 1983, the Department of Justice issued a right-to-sue letter, and Krulik filed this action in December, 1983. In his first complaint, Krulik alleged violations of 42 U.S.C. §§ 1981, 1983, 1985, 1986, and 2000e *et seq;* he asserted jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), and (a)(4). He alleged that the Board, through Orta, Quinones, and others, had discriminated against him because he was Jewish and/or not Puerto Rican. He argued that this discrimination was evident in that these persons had failed to promote him, had rendered his working conditions intolerable, and had humiliated him in the performance of his duties. The complaint also alleged a pendent state claim of "constructive discharge" and breach of contract. On November 26, 1984, Judge Bartels denied the defendant's motion for summary judgment and commenced an eleven-day jury trial. At the close of the evidence, Judge Bartels dismissed Krulik's constructive discharge claim, finding 1) that because plaintiff had voluntarily retired, there was no discharge at all, and 2) he had alleged no viable claim as a matter of state law. Krulik withdrew his claims under §§ 1985 and 1986. Judge Bartels submitted to the jury Krulik's claims under §§ 1981 and 1983, and reserved Krulik's Title VII claims for decision after the jury's verdict.

The jury answered the special interrogatories in the affirmative, finding that Krulik's rights had been denied as a result of intentional discrimination based on his race or religion. The jury also found that the discrimination had caused mental anguish and humiliation; it awarded Krulik $175,-000 for lost earnings, and $100,000 in damages for humiliation and anguish.

On April 11, 1985, Judge Bartels granted the Board's motion for judgment n.o.v. He also granted conditionally the Board's motion for a new trial in the event that the judgment n.o.v. is reversed on appeal. Judge Bartels's memorandum noted his view that there had been no evidence of discrimination at all, and that he had almost directed a verdict for the defendant. As to the failure to promote Krulik, he stated that Krulik had failed to show that he had applied for, or was qualified for, the positions; or that he was treated differently from others seeking promotion; or that his race or religion had been a factor. Further, Judge Bartels found nothing in the staff transfer from which discrimination against Krulik could be inferred. As to the remainder of Krulik's allegations, Judge Bartels noted that the evolving structure of the OBE and the Division may have made Krulik uncomfortable, but that "discomfort as a result of change is not a cognizable constitutional claim under any statute."

Judge Bartels granted alternatively the Board's motion for a new trial on the grounds that 1) no reasonable juror could have found from the evidence at trial that the Board had discriminated against Krulik, intentionally or otherwise, under §§ 1981 and 1983; 2) no evidence justified the jury's finding of damages for Krulik's alleged "humiliation"; and 3) assuming there were damages, the jury miscalculated the amount by according Krulik an eight-year additional work expectancy and by adding some indeterminate percentage to the award instead of following the Court's instruction on discounting a lump sum to present value.

On April 23, Judge Bartels denied Krulik's claims under Title VII. Applying the standard set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), he noted that Krulik had not even carried his prima facie burden of showing that he was in any way discriminated against in his working conditions, in the performance of his duties, or by virtue of any failure to be promoted. Further, Judge Bartels stated that even if Krulik had met this prima facie burden, he would not prevail because the Board had clearly established legitimate, nondiscriminatory reasons for taking the actions that affected Krulik and that these proffered reasons were not a pretext for discrimination.

A judgment n.o.v. may be granted only where the court believes, without weighing the credibility of witnesses or assessing the weight of the evidence, that reasonable persons could have reached only one conclusion from all the evidence. *See Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688 (2d Cir.1983); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970). The trial court must determine whether the evidence adduced at trial, viewed in the light most favorable to the plaintiff, was sufficient to enable a reasonable juror to arrive at the verdict rendered. *See H.L. Moore Drug Exchange v. Eli Lilly & Co.*, 662 F.2d 935, 940 (2d Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1981). Because a plaintiff must prove discriminatory intent in order to prevail on employment discrimination claims under § 1981, *see General Building Contractors Association v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982), and § 1983, *see Washington v. Davis*, 426 U.S. 229, 240–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976), the key question was whether any reasonable juror could have reached the conclusion that the Board or its employees intentionally had discriminated against Krulik on the basis of his race or religion. Judge Bartels found, and we agree, that the jury's verdict of intentional discrimination was unsupported by the evidence.

Krulik failed to offer any proof that the 1979 reorganization of OBE demonstrated any discriminatory intent or effect. Orta certainly had the right to alter the structure of OBE and to add the new Center Director positions. *Cf. Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir.), *cert. denied*, 459 U.S. 1103, 103 S.Ct. 725, 74 L.Ed.2d 950 (1982) (aftereffects of changes within a company did not violate Title VII). Further, no evidence shows that Krulik was the subject of discrimination in the appointment of Center Directors. Orta considered, over the summer of 1979, only those persons who expressed their interest, in writing or orally; Krulik never did so. Krulik acknowledged that he had never formally applied for the directorships, but

stated his belief that he had applied by giving her his resume in March. However, all of the many employees of OBE provided Orta with personal information at that time, by her request. And, indeed, at the time Krulik turned in his resume, the new Center Director positions had not yet even been created.

Krulik argues, however, that Orta required him to make a formal application, while at the same time she actively recruited her friends. This claim is not supported by the evidence. As Judge Bartels found, the only two persons Orta actually contacted were employed outside the OBE and thus were not privy to all the hiring information an OBE employee such as Krulik would have. Even if Krulik's claim were true, it alone could not support a finding of discrimination. Nothing in §§ 1981 or 1983 prevents a municipal supervisor from promoting those employees with whom she prefers to work. By Krulik's own admission, he and Orta were constantly at odds, and thus it is not surprising that she would not seek to advance his career. *Cf. Capers v. Long Island R.R.*, 429 F.Supp. 1359, 1365 (S.D.N.Y.1977) ("Title VII does not require that an employer like his employees"), *aff'd*, 573 F.2d 1291 (2d Cir.1977); *Richardson v. Hotel Corp. of America*, 332 F.Supp. 519, 521 (E.D.La.1971) ("No federal statute prohibits discrimination per se; rather, what is prohibited is discrimination that is racially motivated"), *aff'd*, 468 F.2d 951 (5th Cir.1972).

We agree with Judge Bartels that Krulik's case lacked any evidence that Orta discriminated against him or disliked him because he was white, Jewish, and/or not Hispanic. The record contains only one item of ostensibly "direct" evidence of Orta's discriminatory attitude toward Krulik: the 1970 PREA letter, which Orta signed, opposing Krulik's appointment as head of the ESL program. Although it is true that the letter's language was somewhat strident, calling Krulik's appointment an "offense" to the Puerto Rican community, the surrounding circumstances show that the PREA was angered by Krulik's

perceived lack of qualifications, and not by his race or religion. Orta testified that the PREA had supported Belfrom (an Italian woman) because she had extensive experience in ESL, and had headed the program on an interim basis for the previous three years. Thus, it is stretching matters to claim, as Krulik does, that this one particular letter can support his claim of an entire pattern of "irrational discriminatory animus." *Cf. Meiri v. Dacon*, 759 F.2d 989 (2d Cir.) (dismissing Title VII claim on the grounds that plaintiff had offered only speculative evidence of intentional religious discrimination), *cert. denied*, —— U.S. ——, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

In the absence of direct evidence of discriminatory intent, Krulik must rely solely on his proffered circumstantial evidence of discrimination. He points out that six out of the seven Center Directors Orta appointed were Hispanic. Because Krulik failed to show that he was more qualified than any of the six appointees, however, he must be offering the proof for whatever statistical value it has. Statistical proof is particularly uninformative in the case of the OBE: because the OBE was and is primarily Hispanic in make-up, it is not at all surprising that six of the seven Center Directors turned out to be Hispanic.

Turning to Krulik's claim regarding the 1980 staff transfer, we agree with Judge Bartels that Krulik failed to demonstrate that the decision was motivated by any concerns other than legitimate administrative ones. The 1979 audit (which was conducted by a white Jewish male) had found that the federally-funded Division of High Schools staff was simply misassigned to Krulik, who was then head of a city-funded ESL unit. The evidence showed that the failure to transfer Krulik along with his staff was due to Krulik's own failure to seek out the necessary approvals, as well as Krulik's correspondence indicating that he wished to remain a part of the ESL staff.

Krulik argues, however, that Quinones knew that Krulik wanted to stay with his staff, but left him behind because he wanted to put in "his own person," Roberto Negron (a Puerto Rican, recommended by Orta). Like the claim against Orta, the claim against Quinones is flawed by the lack of any evidence of discriminatory intent. It is true that Quinones may have wished to put in his "own person," and that person turned out to be Hispanic, but the fact remains that the record is barren of evidence that Quinones preferred Negron to Krulik *because* the former was Hispanic, and the latter white and Jewish. We cannot infer that the personal preferences of public employers are inevitably influenced by race—some additional evidence must be shown. Quinones was a signatory of the 1970 PREA letter; as we have already noted, the letter is too inconclusive to support a claim of a discriminatory pattern of behavior.

In light of the absence of direct evidence of discriminatory motive, Krulik again must rely on circumstantial evidence to show that the 1980 staff transfer had such a motive, and there is no evidence to support his claim. First, he did not show that Negron was less qualified than he for the position of Division Program Manager—indeed, the evidence showed that Negron's background was more comprehensive than Krulik's in the field of bilingual education. Second, when Negron left later in 1980 he was replaced on an interim basis by Eli Plotkin, a white Jewish male; Krulik never applied for Plotkin's job when it was to be permanently filled, although he could have done so. As Judge Bartels found, the circumstances of the 1980 staff transfer prove conclusively that it was a legitimate decision designed to correct an imbalance among the bilingual departments of the Board of Education.

Nor does Krulik prove intentional discrimination by his assertion that, following his 1981 transfer to the Division of High Schools, his job lacked "clarification." The evidence showed that, at the Division, Scott advised Krulik specifically of his new responsibilities, and that he performed them for almost two years. Thus, as Judge Bartels found, the record did not support the

claim that Krulik's working conditions constituted further "evidence" of discriminatory treatment; nor did it support the argument—made dramatically to the jury—that Krulik's resulting humiliation and anguish caused his 1983 heart attack.

Finally, intentional discrimination against Krulik cannot be inferred from Scott's failure to secure for him an office on the first or second floors of the Bay Ridge Annex upon his return to work later in 1983. It is true that Scott's testimony and the testimony of Richard Quintanilla, then acting ESL Program Director, conflicted as to whether Scott notified Quintanilla that no space was available on the first and second floors of the Annex. As Judge Bartels found, however, the Division of High Schools had in any event no allotted space on the first two floors, and thus the denial of Krulik's request was not discriminatorily motivated. ▮ Because we agree with Judge Bartels that the record is barren of any evidence of intentional discrimination on the basis of Krulik's race or religion, we need not reach the question of whether Krulik has even established a viable claim under §§ 1981 and 1983. On a claim under § 1981, a plaintiff must show both that he was subjected to intentional discrimination, *see General Building Contractors, supra,* and that this discrimination interfered with a contractual relationship, *see Runyon v. McCrary,* 427 U.S. 160, 170–71, 96 S.Ct. 2586, 2594–95, 49 L.Ed.2d 415 (1976); *Red Elk v. Vig,* 571 F.Supp. 422, 424 (D.S.D. 1983). As the district court noted, it is not clear from the record whether Krulik had a "contract" with the Board of Education or the City; nor is it clear whether these entities may be held responsibile via the doctrine of *respondeat superior* for any contractual breaches caused by Orta, Quinones, or others. We agree with Judge Bartels, however, that these questions are irrelevant in light of the absence of intentional discrimination. ▮ In order to prevail on a § 1983 discrimination claim against a municipal corporation, a plaintiff must prove a custom, policy, or practice of discrimination by that body. *See Monell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). We have held that a discrete act can constitute "policy" when it is performed by an official who has final authority. *See Rookard v. Health and Hospitals Corporation,* 710 F.2d 41, 45 (2d Cir.1983). In addition, an individual official's acts can rise to the level of "policy" when "senior personnel" knowingly "acquiesce" in their subordinates' behavior. *See Turpin v. Mailet,* 619 F.2d 196, 203 (2d Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). We need not decide whether Orta's or Quinones's acts were "final" (although this appears doubtful in light of the supervisory role played by then-Chancellor Macchiarola), or whether the Board's "senior personnel" acquiesced in those acts, because Krulik has failed to demonstrate the intent that is prerequisite to a § 1983 employment discrimination claim. *See Monell, supra.*

▮ We also agree with Judge Bartels's dismissal after trial of Krulik's pendent state claim for constructive discharge, because we agree that Krulik voluntarily retired, and was not "discharged." The Board's actions involving Krulik were motivated by legitimate administrative concerns and thus were within the Board's discretion over Krulik's assignments. *See Van Heusen v. Board of Education,* 26 A.D.2d 721, 722, 271 N.Y.S.2d 898 (3d Dept.1966) (discussing the Board's discretion over assignment of its staff). Even the failure to get Krulik an office on the first two floors of the Bay Ridge Annex, which allegedly was the catalyst of Krulik's retirement, comes within this discretion. Apparently, Krulik was dissatisfied and disappointed with some of the Board's decisions affecting his career, and he may have retired as a result, but this discomfort and any consequent ill health cannot constitute constructive discharge.

Regarding Krulik's Title VII claim, which the district court rejected after it granted judgment n.o.v., the claim must fail. As Judge Bartels held, Krulik did not make a prima facie showing that he was

**24**

discriminated against in any employment decisions or in his working conditions, *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981), and, in any event, the Board offered legitimate justifications for its actions affecting Krulik, *see McDonnell Douglas v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), which Krulik did not show were pretextual. *Id.*

As we conclude that a grant of judgment n.o.v. in favor of the Board was entirely appropriate, we need not consider the alternative grant of a new trial.

Affirmed.