**Neil Macdonald HICKOK, Plaintiff,**

v.

**ORANGE COUNTY COMMUNITY COLLEGE, Defendant.**

**No. 04 CIV 0988 SCR.**

United States District Court, S.D. New York.

Jan. 4, 2006.

Michael H. Sussman, Law Offices of Michael H. Sussman, Goshen, NY, for Plaintiff.

Richard Britt Golden, Burke, Miele & Golden, LLP, Suffern, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER

ROBINSON, District Judge:

Plaintiff, a vocal community member and Green Party activist, attempted to speak at an Orange County Community College lecture about Iraq given by an alumna of the College. After he spoke briefly about the College's allegedly discriminatory actions against the Green Party, Dorothy Szefc, the College's Coordinator of Cultural Affairs, asked Plaintiff to ask a question or be quiet. He was subsequently removed from the lecture hall by campus security. Plaintiff brought this suit, alleging that the College violated his First Amendment rights. Both Plaintiff and Defendant now move for summary judgment. For the foregoing reasons, Defendant's motion is granted and Plaintiff's motion is denied.

### I. Background

Neil Hickok ("Plaintiff") attended a lecture at the Orange County Community College ("College" or "Defendant") on October 29, 2003. The lecture, entitled "State of War ... State of Grace," was given by an alumna of the College, a freelance photojournalist. She showed photos and spoke about life in Iraq, both before and after the war. The lecture was part of a series entitled "Pondering War and Peace."

Plaintiff complains of two events that occurred on the evening of the lecture. First, he alleges that Dorothy Szefc, the Coordinator of Cultural Affairs, and Edward Kiely, second in command of the College's Security Department, told him to remove his anti-Bush t-shirt before the lecture started. Defendant alleges that Ms. Szefc and Mr. Kiely told Plaintiff to

stop selling t-shirts, and did not tell him to remove his own shirt. Plaintiff denies that he was selling t-shirts.

Next, Plaintiff alleges that during the question and answer period following the lecture, Ms. Szefc prevented him from continuing to ask a question, after which security removed him from the lecture hall. Plaintiff's statement began with allegations about the College's treatment of the Green Party on campus.[1] Ms. Szefc interrupted Plaintiff and told him that he should either ask a question or sit down. Plaintiff continued speaking, at one point stating that he did not have any guns or bombs, after which security removed him from the lecture. The parties dispute exactly what occurred after Plaintiff began speaking, but both agree that the incident ended after security removed Plaintiff from the lecture hall.

Discovery is complete, and both parties have filed for summary judgment.

### II. Discussion

#### A. Standard of Review

Summary judgment is appropriate only if "there is no genuine issue as to any material fact[.]" Fed.R.Civ.P. 56(c). Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id.

The initial burden falls on the moving party who is required to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

---

[1]. Plaintiff alleges that he was planning to ask the lecturer to "comment on the extent freedom of expression in our country might impact the course of American policy in Iraq." (Hickok Aff. at 6.)

(1986). If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" *Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir.1999) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998)).

■ When considering cross-motions for summary judgment, the same legal standards apply. A court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir.2004) (citations omitted). A court must deny both parties' motions for summary judgment if it finds the existence of disputed material facts. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir.2001). Therefore, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.* at 121.

### B. Municipal Liability Under Monell

■ Under § 1983, a municipal corporation cannot be held liable solely on a theo-ry of *respondeat superior*. *See Monell v. Dep't of Social Serv.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Krulik v. Bd. of Educ. of City of New York*, 781 F.2d 15, 23 (2d Cir.1986). The plaintiff must demonstrate "a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation."[2] *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Therefore, to find Defendant, a public college, liable for any acts against Plaintiff, this Court must find that Defendant had a policy or custom that led to Plaintiff's alleged deprivations.

### 1. Formal Policy

Plaintiff argues that the College's policy of keeping lectures "nonpolitical" caused his alleged deprivations. According to Ms. Szefc, the College attempts to keep lectures apolitical, meaning that the College does not want to "take ... sides ...." (Sussman Aff. Ex. 14 at 11.) This Court will assume, without deciding, that the College has an official policy of keeping lectures "nonpolitical" in the sense that the College wishes to promote dialogue that is nonpartisan. The fact that the College has such a policy, however, is not sufficient to establish *Monell* liability.

### a. The College's Policy is Constitutional

The College can require that lectures avoid endorsing one political party over

---

**2.** The point of this requirement is to ensure that a municipality is liable for a plaintiff's deprivation only if the municipality was responsible for that deprivation. "The plaintiff must ... demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.... [The] plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the*

*County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in original); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir.2003) ("The 'policy or custom' requirement ... is 'intended simply to distinguish acts of the municipality from acts of its employees, in order that municipal liability be limited to conduct for which the municipality is actually responsible.'") (quoting *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 142 (2d Cir.1999)).

another because the College's lectures are a limited public forum.

The First Amendment does not guarantee unfettered access to government-owned property. "In analyzing governmental restrictions on expressive activity, the Supreme Court has defined three categories of public property and determines the right of access according to the category in which the particular property falls." *Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d 688, 691–92 (2d Cir.1991); *see also Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 799–802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The first category is the traditional public forum, which is public property that has historically been open to speech-related activities, such as sidewalks and public parks.[3] *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948. The second category of public property is the nonpublic forum. A nonpublic forum is property that has not been traditionally open to the public for communication. *Id.* at 46, 103 S.Ct. 948. The third category is the designated public forum, which is property that would constitute a nonpublic forum except that the government has intentionally opened it for the public as a place for expressive activity. *See Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439; *Perry Educ. Ass'n*, 460 U.S. at 45–46, 103 S.Ct. 948.

In reviewing the relevant case law, a sub-category emerges, known as the limited public forum. *See Travis*, 927 F.2d at 692; *Daily v. New York City Housing Authority*, 221 F.Supp.2d 390, 398–99 (E.D.N.Y.2002) ("Somewhat confusingly, the Supreme Court and lower courts also recognize another category, the limited public forum.") A limited public forum "is created when government opens a nonpublic forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Travis*, 927 F.2d at 692; *see also Good News Club v. Milford Central Sch.*, 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("When the State established a limited public forum, the State is not required to and does not allow persons to engage in every type of speech. The State may be justified in reserving its forum for certain groups or for the discussion of certain topics.") (citations omitted).

The lecture hall at the College is not a traditional public forum. As the Supreme Court has noted: "[a] university differs in significant respects from public forums such as streets or parks or even municipal theaters." *Widmar v. Vincent*, 454 U.S. 263, 269 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) ("The public schools do not possess all of the attributes of streets, parks, and other traditional public forums . . . .").

Therefore, this Court must consider whether the lecture hall is a designated or limited public forum. To create a designated public forum, the government "must intend to make the property 'generally available' to a class of speakers." *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (quoting *Widmar*, 454 U.S. at 264, 102 S.Ct. 269) (holding

---

**3.** These traditional public forums "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948 (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)).

that a televised debate on public television was a limited public forum). "A designated public forum is not created when the government allows selective access for individual speakers rather than a general access for a class of speakers." *Id.* at 679, 118 S.Ct. 1633. Therefore, if the College's facilities have not been opened for "indiscriminate use by the general public," and have "instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on ... speech ...." *Hazelwood Sch. Dist.*, 484 U.S. at 267, 108 S.Ct. 562 (quoting *Perry Educ. Ass'n*, 460 U.S., at 46, 103 S.Ct. 948 n. 7); *see also Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 351 (2d Cir.2003); *Cornelius*, 473 U.S. at 803, 105 S.Ct. 3439.

■ The lecture hall at the College is a limited public forum. While "[a]ll Lyceum events are opened to the general public, [and] most are free," (Szefc Dep. at 23), the College did not open its doors for "indiscriminate use by the general public." *Hazelwood Sch. Dist.*, 484 U.S. at 267, 108 S.Ct. 562. Rather, the school invited a certain speaker and the general public to its campus to speak about Iraq, or more broadly, to contribute to the lecture series on war and peace. This is in contrast to the university's policy in *Widmar*, where the school opened its facilities to any student group that wished to use them.[4] *Widmar*, 454 U.S. at 267, 102 S.Ct. 269; *cf. Daily*, 221 F.Supp.2d at 398 (noting that public school facilities during after-school hours are "clearly" limited public forums); *Goulart v. Meadows*, 345 F.3d 239, 250 (4th Cir.2003) (same); *American Civil Liberties Union v. Mote*, 423 F.3d 438, 444

(4th Cir.2005) ("[The university] campus is a limited public forum."); *Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1213 (11th Cir.2004) ("When a school retains editorial control over a forum, it has not created a designated public forum.").

■ Because the College created a limited public forum, the College's restrictions on speech must "not discriminate against speech on the basis of viewpoint," and "must be reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106–107, 121 S.Ct. 2093. The Second Circuit has explained that in a limited public forum,

> constitutional protection is afforded only to expressive activity of a genre similar to those that government has admitted to the limited forum. Thus, in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.

*Travis v. Owego–Apalachin Sch. Dist.*, 927 F.2d 688, 692 (2d Cir.1991) (citations omitted). The College's policy of prohibiting events if they "take ... sides," (Sussman Aff. Ex. 14 at 11), is a "blanket exclusion" as it does not discriminate against any speaker's viewpoint to the advantage of another speaker's viewpoint. Under this policy, the College would not hold an event promoting the exclusive viewpoints advocated by the Republican, Democratic, or Green parties. This restriction does not exclude expression of a particular viewpoint and is reasonable in light of the

---

**4.** The Supreme Court has noted that maintaining a distinction between limited public forums and designated public forums "encourage[s] the government to open its property to some expressive activity in cases where,

if faced with an all-or-nothing choice, it might not open the property at all." *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 680, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998).

purposes of the lectures, which are to promote discussion and illuminate ideas. *Cf. Arkansas Educ. Television Comm'n,* 523 U.S. at 682, 118 S.Ct. 1633 (noting that the decision to exclude a political candidate from a debate was viewpoint neutral and reasonable). Therefore, the College's policy is an appropriate restriction for a limited public forum.

### b. Plaintiff Has Not Shown That Policy Led to Injury

 As the College's policy is constitutional, this Court must consider whether this policy was applied in an unconstitutional manner. Where a plaintiff alleges that a constitutional policy caused his or her injury, the plaintiff must do more than simply assert that the policy exists. The plaintiff must show that the unconstitutional application of a constitutional policy is *itself* municipal policy. "Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, ... the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004). Here, Plaintiff has not established how the alleged actions of College employees "may be said to represent the conscious choices" of the College, and, therefore, has not shown how Defendant's constitutional policy creates municipal liability.

### 2. *Inferring Custom From a Widespread Practice*

 Even though Plaintiff has not demonstrated that the College has a formal policy that caused his alleged depriva-

tions, he may rely on a custom of the College to establish municipal liability. A plaintiff may show that an unconstitutional practice was "so widespread as to permit an inference that the [municipality] had a policy or custom" of such violations. *Patterson v. County of Oneida,* 375 F.3d 206, 227 (2d Cir.2004); *Bd. of the County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."). A plaintiff may also show that the pervasive discriminatory practices of subordinate employees was "so manifest as to imply constructive acquiescence of senior policymaking officials." *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992); *see also Nicholson v. Scoppetta,* 344 F.3d 154, 166 n. 5 (2d Cir.2003).

Plaintiff argues that several events, in addition to the incident at issue, demonstrate that Defendant has an unconstitutional policy of excluding those with contrary political views—namely the Green Party—from campus. In the alternative, Plaintiff argues that these events at least raise a jury question as to whether Plaintiff was censored as part of a policy or custom to exclude dissenting political views. This Court concludes, however, that the following events, whether taken alone or considered together, are insufficient to allow a reasonable jury to conclude that Defendant had a policy or custom that caused Defendant's employees to prevent Plaintiff from making his statements during the lecture and to remove him from the auditorium.[5]

---

**5.** It should again be noted that Plaintiff was initially allowed to ask a question at the Col-

lege's lecture, and it was only after Plaintiff appeared to make unconnected remarks

Plaintiff alleges that the College administration cancelled a speaking engagement by NYS Green Party Gubernatorial Candidate Stanley Aronowitz on the day of the event and that Mr. Aronowitz was removed from campus by security. However, Plaintiff relies entirely on uncorroborated hearsay in his attempt to prove that Mr. Aronowitz showed up at the College and that he was prevented from speaking.[6] Moreover, even if Mr. Aronowitz did show up at the College and was prevented from speaking, there is no evidence before this Court from which one could conclude why he was prevented from speaking. Plaintiff merely speculates as to why Mr. Aronowitz was prevented, if in fact he was prevented, from speaking.

Plaintiff next alleges that Scott Ritter, a former United Nations weapons inspector, was asked to avoid certain topics when he came to campus to give a lecture. (D. Mem. Summ. J. at 9.) Again, however, Plaintiff only has "secondhand knowledge" of this incident and does not even recollect who told him about it. (Cooper Aff. Ex. A at 68.) In contrast, Ms. Szefc states that neither she, nor, to her knowledge, anyone else, spoke to Mr. Ritter about limiting the content of his speech. (Szefc Aff. at 3.) Plaintiff relies heavily on an e-mail, from one of the event organizers to Ms. Szefc, that noted the College's "skittishness" about the event. (Sussman Aff. Ex. 6.) However, there is no evidence indicating that the College prohibited Mr. Ritter from sharing any dissenting political views. Plaintiff does not contest that when Mr. Ritter spoke on campus, his lecture, which

was entitled "The War With Iraq: How Did We Get There? Why Are We Still There," (Szefc Aff. Ex. A at 1), was "explicitly critical of the United States government." (Szefc Aff. at 2–3.)

Plaintiff also alleges that the President of the College has directed that all political groups be bi-partisan. The basis for Plaintiff's argument is minutes from a meeting held in September 2004. (Sussman Aff. Ex. 12.) Plaintiff claims that the President's directive excludes third party activists. Plaintiff's argument, however, conveniently ignores the final sentence of the minutes. The meeting participants concluded that the College should ensure that "groups ... be open to all political candidates to promote discussion." *Id.*

Plaintiff further alleges that the President excluded five third-party candidates when he sought to sponsor a debate between the Republican and Democratic candidates for the United States Senate. Once again, Plaintiff's claim is insufficient. First, it is not clear whether the debate even took place. Second, the Supreme Court has held that a government organization may invite only the leading candidates to a political debate. *See Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 680, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (noting that allowing all candidates to participate in a political debate "would result in less speech, not more").

Finally, Plaintiff alleges that the College President refused to allow presidential candidate Ralph Nader to speak on campus. Plaintiff, however, overstates the evidence. Plaintiff allegedly called the Presi-

---

about the Green Party (without actually asking a question) that he was prevented from continuing his remarks.

6. Plaintiff acknowledges that he only has "secondhand knowledge" of this incident. (Cooper Aff. Ex. A at 65–66.) Jennifer Broussard, a student at the College, "went to go

hear [Mr. Aronowitz] speak," but she has no other first-hand knowledge of the incident other than the fact that he did not speak at the College that day. (Sussman Aff. Ex. 12 at 40–43.) Ms. Szefc states that she has unaware of any scheduled appearance by Mr. Aronowitz. (Szefc Aff. at 2.)

dent and asked about the possibility of Mr. Nader coming to the College. According to Plaintiff, the President told him "that they [the College] would not be interested in that and that it was highly unlikely Ralph Nader could speak on the campus . . . ." (Cooper Aff. Ex. A at 63.) That single, off the cuff statement, if made, falls short of establishing that the College has a policy of prohibiting dissenting political voices. There is no evidence that anyone had even attempted to invite Mr. Nader to campus, so the President was merely speculating about a hypothetical possibility.[7] The College President never prohibited Mr. Nader from speaking on campus. A reasonable jury could not, from a conversation based on pure conjecture and with the other evidence to the contrary,[8] conclude that the College has a policy of prohibiting political dissent. In fact, if said, the President's statement is consistent with the College's position of "not taking sides" in the partisan political debate. Moreover, if this Court allowed a jury to find that the College had a policy of stifling dissent, it would defeat the underlying purpose of the policy or custom requirement, which is to ensure that the "municipality was the 'moving force' behind the injury alleged." *Bd. of County Comm'rs,* 520 U.S. at 404, 117 S.Ct. 1382. This alleged conversation between Plaintiff and the College President is simply not enough to establish that the College was the "moving force" behind Plaintiff's alleged injuries. Thus, in the view of this Court, the President's statement does not establish that the College has a policy of stifling third party speech.

Not only are Plaintiff's allegations insufficient standing alone, they must be considered in light of the fact that there is strong evidence suggesting that Defendant allows and even encourages dissenting political views to be heard on campus. Defendant has hosted speakers who have dissenting political views. For example, in addition to Mr. Ritter, Mark Danner, an author and journalist, in a speech entitled "On the Limits of Power: Terror, Iraq, and the American Dream," spoke about terrorism as being used "as an ideological justification for use of U.S. power in the world." (Szefc Aff. at 3; Ex. A at 2.) Further, as discussed above, in the only explicit statement about political discussions presented to this Court, Defendant concluded that "groups should be open to all political candidates to promote discussion." (Sussman Aff. Ex. 12.)

In sum, Plaintiff has not presented sufficient evidence that would allow a reasonable jury to conclude that the College has a widespread practice of stifling dissenting political voices.

### 2. Actions of Officials With Final Policymaking Authority

Even if a plaintiff has not established that the College has a policy or custom that would create municipal liability, he or she may establish municipal liability by showing that certain municipal officials acted inappropriately. While actions by a subordinate employee cannot create liability for a municipality, actions by a single municipal official can do so.[9]

---

7. Ms. Szefc stated that she was unaware of any attempt to bring Mr. Nader to the College during the 2000 Presidential Elections. (Szefc Aff. at 2.)

8. *See supra* p. 11 and *infra* p. 13 (discussing evidence that Defendant permits dissenting political views on campus).

9. A municipality may also be liable if a plaintiff can prove "that 'the authorized policymakers approve[d] a subordinate's decision and basis for it.' " *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir. 2004) (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)); *see also Krulik v. Bd. of Educ. of*

"[I]f the challenged action is directed by an official with 'final policymaking authority,' the municipality may be liable even in the absence of a broader policy." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir.2003) (quoting *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 142 (2d Cir.1999)); *see also Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir.2003). A final policymaker can even create municipal liability when he or she acts only once. *E.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."); *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir.2004).

 A threshold inquiry, then, is which officials have final policymaking authority. This is a question of law for the court. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). In determining which individuals have final policymaking authority for Defendant, this Court may consider state and local law as well as common practices associated with the official's position. *See id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 n. 1, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)) ("Reviewing the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law,' the trial judge must identify those officials or governmental bodies who speak with final policymaking authority ...."). This Court should examine "the official's scope of employment and his role within the municipal

corporate organization." *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir.1983).

Neither Ms. Szefc nor Mr. Keily is a final policymaking official of the College. Ms. Szefc is the Coordinator of Cultural Affairs, which is a part-time position. She reports to the Director of Student Life who, in turn, reports to the Vice President of Student Development. In her position, Ms. Szefc is not "an official [with] final authority over significant matters involving the exercise of discretion." *Id.* Mr. Keily is the evening Security Coordinator, which is also a part-time position. He is second in command and reports to the Director of Safety and Security at the College. As Mr. Keily is not even head of the Security Department, he does not have final authority over matters of security. Therefore, he is not a final policymaking official of the College. There has been no evidence presented showing either Ms. Szefc or Mr. Keily as being in a position, as part-time, mid-level employees, to set College policy. As neither Ms. Szefc nor Mr. Keily is an official with final policymaking authority, Plaintiff cannot establish municipal liability simply by pointing to the actions of either of these employees.

 The President of the College is the only official who was both involved in any of the events at issue and could be considered a final policymaker. This Court will assume, without deciding, that the President is a final policymaking official of the College. According to Plaintiff, when asked about the possibility of Ralph Nader coming to the College, the Presi-

---

*City of New York,* 781 F.2d 15, 23 (2d Cir. 1986). If a plaintiff alleges that a subordinate employee committed the violation, "municipal liability turns on the plaintiff's ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." *Amnesty*

*America,* 361 F.3d at 126. A plaintiff can show this by establishing that the policymaker ordered the subordinates' actions or that the policymaker chose to ignore the subordinates' actions. *Id.* Here, Plaintiff has not alleged that a policymaker has either ordered or ignored any of the conduct at issue.

dent told Plaintiff "that they would not be interested in that and that it was highly unlikely Ralph Nader could speak on the campus ...." (Cooper Aff. Ex. A at 63.) While this Court can find municipal liability from a single decision by an official policymaker, here, the President's statement is insufficient to establish municipal liability.

 A court can find municipal liability from a single decision only in "appropriate circumstances," *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292, which do not exist in this case. The Supreme Court has rejected the claim that "identification of an act of a proper municipal decisionmaker is all that is required to ensure that the municipality is held liable only for its own conduct." *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The trier of fact must determine whether the final policymaker's conduct has "caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Jett*, 491 U.S. at 737, 109 S.Ct. 2702 (citations omitted). Plaintiff has not alleged either that the President's statement caused Plaintiff's injuries or that the President acquiesced in a longstanding practice of the College employees.[10] Moreover, a plurality of the Supreme Court has held that

"municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292 (plurality) (Brennan, J.). Unlike a legislative body passing a formal resolution, *see, e.g., Owen v. Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), the President's statement could not be construed as "a deliberate choice to follow a course of action ... from among various alternatives."

### IV. Conclusion

Based on the foregoing, Defendant is entitled to summary judgment because Plaintiff has not established any policy or custom that would create liability for the College. Accordingly, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

---

10. The President's statement is materially different from a formal decision of a legislative body, *see Owen v. Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), or a prosecutor specifically ordering an action that resulted in plaintiff's injury. *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 406, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). When a plaintiff argues that a final policymaker's single decision should create municipal liability, the plaintiff must establish fault and causation. *See id.* at 405, 117 S.Ct. 1382 ("To the extent that we have recognized a cause of action under § 1983 based on a single decision attributable to a municipality, we have done so only where the evidence that the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also proved fault and causation."). Here, Plaintiff has not established either fault or causation.